UNITED STATES of America, Appellee,

v.

Bernard GELB, Defendant–Appellant.

No. 1229, Docket 89–1038.

United States Court of Appeals,
Second Circuit.

Argued May 30, 1989.

Decided Aug. 1, 1989.

Paul A. Batista, New York City, for defendant-appellant.

Gordon E. Mehler, Asst. U.S. Atty., New York City (Andrew J. Maloney, U.S. Atty. for the Eastern District of New York, M. Lawrence Noyer, Jr., Asst. U.S. Atty., New York City, of counsel), for appellee.

Before LUMBARD, NEWMAN and MINER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Bernard Gelb appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Eastern District of New York (Van Sickle, J.).* Having engaged in schemes to avoid paying postage on mass mailings, Gelb was found guilty of one count of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1982); one count of mail fraud, 18 U.S.C. § 1341 (1982); fifty counts of bribery, 18 U.S.C. § 201(b)(1)(C) (1982 & Supp. V 1987); and three counts of willfully making and subscribing false corporate income tax returns, 26 U.S.C. § 7206(1) (1982).

Gelb claims, *inter alia*, that by conducting a trial during the Jewish holiday season, which, he asserts, made it impossible to include Jews in the venire from which his jury was selected, the district court deprived him of his sixth and fourteenth amendment rights to a jury representative of his community. He argues also that his mail fraud conviction was improper because dispatching mail without paying postage does not constitute mail fraud. Furthermore, he claims that paying Postal Ser-

vice employees to ensure proper service is not bribery, and that there was insufficient evidence to support his bribery conviction in any event. Because the predicate offenses of mail fraud and bribery are said to be insupportable, Gelb argues that the RICO conviction cannot stand. Gelb contends also that evidence about "payoffs" to an institution other than the Postal Service, inadvertently introduced by a government witness, had a prejudicial effect upon the jury. Finally, Gelb claims that the district court committed reversible error during voir dire by not asking the jury venirepersons if they understood that testimony of a law enforcement official is not entitled to enhanced credibility simply by virtue of the official position of the witness.

It appears from the record that Jewish jurors are excused from duty only on Jewish holidays, not during the whole holiday season. As Gelb's trial was suspended for only the days necessary to observe the Jewish holidays, Gelb's sixth and fourteenth amendment rights were not harmed by the jury selection process. Contrary to Gelb's understanding of mail fraud, we hold that defrauding the Postal Service of postage does constitute mail fraud. Since the evidence supports Gelb's conviction for bribery as well as mail fraud, his conviction for violating RICO was proper. The "payoff" evidence inadvertently introduced by the government to which Gelb takes exception was not prejudicial. Finally, any error the district court may have committed during voir dire was harmless. Accordingly, we affirm.

## BACKGROUND

EDP Medical Computer Systems, Inc. ("EDP") is a mass mailing and bill collection agency in Queens, New York that Bernard Gelb founded in 1969 and has managed ever since. While Gelb habitually held himself out to the public as EDP's sole shareholder, he actually held no shares in EDP, which had twenty-four shareholders,

* The Hon. Bruce Van Sickle of the United States District Court for the District of North Dakota, sitting by designation.

including Gelb's wife. In its own name and those of its affiliates and subsidiaries, EDP engaged in magazine subscription solicitations, collections for a number of New York City agencies, and data processing and billing for the Bronx–Lebanon Hospital. A common feature of EDP's activities was the dispatch of large amounts of mail; EDP's mail volume varied between 100,000 and 1,000,000 pieces per mailing. By all accounts, Gelb's business was successful. As a matter of fact, Gelb boasted that EDP had been the most successful of the collection agencies used by the New York City Environmental Control Board in 1985.

Generally, EDP used two types of first-class postage for its mailings—permit mail and metered mail. With permit mail, the mailer is assigned a permit number, which is placed on envelopes by the mailer using either a preprinted envelope or a rubber stamp. When a stack of permit mail is brought to the post office, a sample piece is weighed, as is the entire stack. The weight of the stack is divided by the weight of the sample piece. This yields the number of pieces in the stack and the appropriate charge is then levied on the mailer. Thus, permit mail is paid for at the time of mailing.

With metered mail, the mailer rents postage meters from the post office. A postage meter contains two internal registers, one ascending, which shows the total amount of postage imprinted by the meter since it first was put into circulation, and the other descending, which shows the amount of postage available on the meter at the moment of observation. Whenever the meter stamps out postage, the machine adds the amount of that postage to the ascending register and deducts it from the descending register. When the descending register runs down, the mailer brings the meter to the post office and purchases postage, the amount of which is added to the descending register and recorded on Postal Service Form 3610. Thus, metered mail is prepaid. Needless to say, access to the internal mechanisms of a meter, which is possible only by breaking a lead wire seal, is available only to authorized Postal Service employees. Most postage meters are manufactured by the Pitney–Bowes Corporation.

Gelb defrauded the Postal Service in two ways. From 1975 to 1978 he avoided the payment of postage by burying in sacks or hampers brought to the post office large quantities of permit mail beneath a few layers of metered mail. By such packing, Gelb created the impression that the entire sack or hamper already had been paid for, when, in fact, most of it had not.

Sometime in 1978 Gelb devised another scheme to avoid paying postage. After Gelb urged him to find "a way to save postage," EDP employee Arthur Sommer delivered to Gelb a stolen Pitney–Bowes postage meter. At Gelb's behest, Sommer broke the meter's seal and gained access to the inner mechanisms of the machine. He filed off the meter's unique serial number, which is engraved on a metal strip and is impressed onto a meter stamp anytime postage is dispensed from the machine, and glued onto it a metal strip fraudulently engraved with the serial number of one of Gelb's legally obtained meters. As a result, Gelb had in his possession a meter whose existence was not known to either the Pitney–Bowes Corporation or the Postal Service, and that produced meter stamps that appeared to have been printed by a legitimate machine. Gelb was able to manipulate at will the stolen machine's descending register. Thus, he had available unlimited amounts of postage for which he would not have to pay. Gelb used this stolen machine for nearly seven years.

Sommer stole a second Pitney–Bowes meter at Gelb's command and, as he did with the first machine, replaced its engraved serial number with a metal strip upon which was engraved the serial number of one of the meters legally registered to EDP. All told, Gelb had two stolen meters available to him, each of which could stamp out an impression identical to one created by a legal meter.

Between 1978 and 1985 EDP purchased only small amounts of postage for its six legal meters. Because the Postal Service requires that meter postage be bought or

meters be inspected no less than once every six months and makes unannounced meter inspections, EDP ran enough mail through its legal machines to create the impression that these machines were used in accordance with Postal Service regulations. However, EDP used the two stolen meters to stamp postage for the bulk of its metered mail, often "a million [pieces] at a time."

EDP claimed as tax deductions postage stamped from the illicit meters. The discrepancy between the postage purchases recorded on Postal Service Forms 3610 and the amount claimed as business deductions on EDP's tax returns generally exceeded $145,000 a year. For example, in tax year 1980, Forms 3610 show that EDP purchased $70,020 in meter postage, but Gelb signed an EDP tax return listing deductions for postage in the sum of $265,906.

Testimony at trial revealed that Gelb, through associates, paid postal employees to ensure that his permit mail scheme went undetected. Two postal service employees who worked on the receiving platform of the Flushing Annex Post Office, Thomas Geraghty and John Krikorian, testified that they had received money from an EDP mailer named "Bernie," to whom Geraghty referred as the "Candy Man." Bernie told Krikorian at their first meeting that when EDP mail sacks were brought to the Flushing Annex Post Office, even without proper documentation, "[y]ou don't have to do nothing, just transfer it on to the trucks," and gave him 100 dollars. Bulk mail unaccompanied by documentation must be processed and the postage verified before being loaded onto delivery trucks. As a result of Bernie's instructions, whenever EDP's mail was brought to the Flushing Annex Post Office, Krikorian and Geraghty did not notify a supervisor or pass the mail on for further processing. Krikorian eventually lost his job for accepting money from Bernie.

Sometimes the money was paid by EDP truck drivers or assistants who had been seen with Bernie by post office employees. The money usually was delivered in an envelope addressed in Gelb's handwriting to a "Richard King," and always was packaged between two computer punch cards. Generally, money was received by the post office employees either once a week or once or twice a month, but never less than once a month. The money used for the bribes came from checks cashed by two EDP employees, James Papa and Sherman Simanowitz.

In July 1987, a grand jury returned a seventy-eight count superseding indictment charging Gelb with one count of violating RICO, one count of mail fraud, sixty-six counts of bribery and ten counts of personal and corporate tax violations. Count one charged that EDP and its affiliates and subsidiaries constituted an "enterprise" under 18 U.S.C. § 1961(4) and alleged that Gelb had conducted through EDP a pattern of racketeering involving two acts of mail fraud (i.e. both schemes to avoid paying postage) and sixty-six acts of bribery. Counts two through seventy-eight charged separate mail fraud, bribery and tax violations. EDP itself was charged with one count of mail fraud.

The trial of Gelb and EDP was scheduled to commence August 22, 1988 and last for six to seven weeks. On August 9, Gelb moved to delay the trial until the week of October 11 or, in the alternative, to have the trial suspended on various dates so that he, as an orthodox Jew, could observe the Jewish holidays that generally occur in the early autumn. Gelb argued that permitting the trial to proceed as scheduled would deprive him of his sixth and fourteenth amendment rights to a jury composed of his peers, which he asserted must include Jews. Gelb expected that Jews would obtain postponement of their jury duties until after the Jewish holiday season. In support of his motion, Gelb submitted an affidavit of his wife in which she averred that she had spoken with someone at the Clerk's Office of the United States District Court for the Eastern District of New York, who told her that Jews called to serve jury duty in September and October 1988 "would be routinely excused from jury duty during the period simply by writing to the Jury Administrator." The government responded with an affirmation by the United States

Attorney for the Eastern District of New York stating that, according to Aileen O'Hare, a Jury Clerk of the Eastern District court, Jews were not excused for the entire holiday period, but only for the specific dates of the holidays. The court declined to adjourn the trial, but agreed to suspend the trial on all days necessary to permit Gelb to observe the Jewish holidays.

On August 17, Gelb unexpectedly underwent elective surgery to remove a stone from his gall bladder. He requested a twelve week postponement of his trial so that he could recuperate. The court granted him a postponement of about one month. Trial eventually commenced on September 14, 1988.

The court conducted the voir dire of the venirepersons and defense counsel was permitted only to propose to the court voir dire questions. During voir dire, the court did not inquire into the religious beliefs of the prospective jurors, nor did Gelb's attorney request any such inquiry. Later, during trial, the court observed: "I have never felt the Jewish people are a cognizable racial group, different from the majorities of the rest of the whites in the United States."

Anticipating that the prosecution would base at least part of its case on government witnesses, the defense suggested the following voir dire question: "Do you understand that just because a witness happens to be a police officer or law enforcement agent, that such individual's testimony is entitled to no greater weight than the testimony of any other witness, nor are such individuals entitled to any greater credence simply because of their position?" The court declined to pose that or any similar question to the potential jurors.

Proposing to prove Gelb's intent, the government moved *in limine* to admit similar act evidence that Gelb had bribed an employee of the Bronx–Lebanon Hospital with cash packaged in the same manner as the charged bribes of the postal employees. The district court ruled that the evidence could be used by the government only in rebuttal, not in the government's case-in-chief. However, in its case-in-chief, the prosecution asked its witness Sherman Si-

manowitz: "Did Mr. Gelb ever tell you why he needed this cash?" Simanowitz responded: "He used it to a large extent to pay various employees, including myself, a portion of our salaries in cash. And also it was necessary to pay off some people at the post office and at the hospital."

Gelb immediately moved for a mistrial. The court expressed the view that this was "a serious breach ... [and] an unwarranted slander of the defendant." An *in camera* examination of Simanowitz revealed that he had been cautioned by the government to avoid mentioning the hospital payoffs. Simanowitz explained: "I hesitated when I had to, the question was asked, the last series of things I mentioned, in fact I was waiting for an objection or someone to stop me. Nobody did. It was responsive to the question, in fact." The court denied the motion for a mistrial, instructed the jury to disregard the testimony, and precluded the government from offering the evidence again, even in rebuttal.

Following a jury verdict, a judgment was entered convicting Gelb of the RICO count, the mail fraud count, fifty bribery counts and three of the tax counts. EDP was acquitted of the single mail fraud count with which it was charged. The court sentenced Gelb to imprisonment for thirteen years, to be followed by a five-year term of probation, and ordered him to pay $5 million dollars in restitution and $101,000 in fines.

Gelb appeals his conviction, proffering various arguments. He argues that the court's refusal to adjourn his case until after the Jewish holiday season led to an unrepresentative jury. He asserts that mail fraud cannot possibly include a scheme to defraud if the content of the mailed matter is irrelevant to the success of the scheme. Gelb seeks also to upset his bribery conviction; he contends that the bribery statute does not cover his cash payments to the postal service employees and that the evidence adduced was insufficient to support his conviction on the bribery counts. Since, according to the theory of Gelb's appeal, mail fraud was not committed and bribery was not properly estab-

lished, Gelb argues that the RICO conviction should fail for lack of predicate offenses. Gelb asks also that his conviction be reversed because the testimony about the payments at Bronx–Lebanon Hospital was introduced improperly by the government. As well, he contests the district court's failure to inquire of the prospective jurors during voir dire whether they understood that testimony by a law enforcement officer is not entitled to credence greater than testimony by anyone else simply by virtue of the officer's position.

## DISCUSSION

### 1. *The Jury*

The sixth amendment right to a trial by jury unquestionably includes the right to a petit jury drawn from a pool that is a representative cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 537–38, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975); *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985–86, 90 L.Ed. 1181 (1946). While the equal protection clause of the fourteenth amendment prohibits underrepresentation of minorities in juries by reason of intentional discrimination, *Alston v. Manson*, 791 F.2d 255, 257 (2d Cir.1986), *cert. denied*, 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), "[t]he sixth amendment is stricter because it forbids any substantial underrepresentation of minorities, regardless of ... motive," *id.*

Gelb claims that by not postponing his trial until after the Jewish holiday season, the court deprived him of a pool of potential jurors representative of his community, thus violating his sixth and fourteenth amendment rights. Gelb relies on *Batson v. Kentucky*, 476 U.S. 79, 96–97, 106 S.Ct. 1712, 1722–23, 90 L.Ed.2d 69 (1986), which teaches that in proving an equal protection claim the defendant bears the initial burden of demonstrating that the prosecution improperly exercised peremptory challenges to remove members of a cognizable racial group from the jury. However, *Batson*, which involved a claim of invidious discriminatory intent, concerned racially biased prosecutorial conduct that excluded a cog-

nizable racial group from the jury; allegations of such conduct are absent from this case.

Pertinent to Gelb's claim is *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), which established the requirements that must be met for a defendant to make out a prima facie showing of a violation of the sixth amendment's fair cross-section protection. Under *Duren*, Gelb must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.*

▆▆ Jews are a cognizable group for purposes of 42 U.S.C. § 1982. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18, 107 S.Ct. 2019, 2021–22, 95 L.Ed.2d 594 (1987). There is no reason to distinguish between section 1982 and the constitutional claim made by Gelb in this case. Accordingly, as the government concedes, Gelb meets the first prong of the *Duren* test.

▆▆ As to the second prong, Gelb cites census statistics to show that numerically Jews are a significant portion of the population in three of the five counties in the Eastern District of New York. He then infers underrepresentation of Jews in his jury pool from his observation that "[v]irtually none of the [potential jurors'] surnames ... carried any suggestion of being Jewish." He also claims that Jews could not have been on his venire because they would have been excused from jury duty during the days when his trial was conducted.

Gelb fails to demonstrate adequately that Jews were underrepresented in his venire. Stereotypical ethnic or religious characterizations of surnames are unreliable and only tenuous indicia of a jury's

makeup. *See United States v. Bucci*, 839 F.2d 825, 834 (1st Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 117, 102 L.Ed.2d 91 (1988); *United States v. Sgro*, 816 F.2d 30, 33 (1st Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1021, 98 L.Ed.2d 986 (1988). Absent a showing of a correlation between being Jewish and having a Jewish-sounding surname, underrepresentation cannot be presumed. *See Bucci*, 839 F.2d at 834. As well, the credible evidence shows that Jews can absent themselves from the jury selection process only on the specific dates of the holidays in question, not during the entire holiday season. Gelb's trial recessed during the days necessary for him to observe the holidays; any Jewish juror who wanted to observe the holidays would not have had to disqualify himself from this trial. Accordingly, Gelb's sixth amendment claim must fail for lack of a showing that Jews were underrepresented in his venire. For the same reason, his fourteenth amendment claim also must fail. *See Castaneda v. Partida*, 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Because we hold that Gelb has not satisfied the second prong of the *Duren* test, we need not address whether Jews were systematically excluded in the jury selection process.

### 2. *Mail Fraud*

Gelb argues that the mail fraud statute, 18 U.S.C. § 1341, encompasses only fraudulent schemes dependent on the content of mailed materials and does not criminalize avoidance of the payment of postage. He contends also that the mail fraud statute implicates only schemes that involve "false promises and misrepresentations," *McNally v. United States*, 483 U.S. 350, 359, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987). Section 1341 criminalizes the use of the U.S. mails for, *inter alia*, executing "any scheme or artifice to defraud." While we have not found a case in which the mail fraud statute was held to apply to a scheme that involved fraud that did not depend on the content of the posted materials used in that scheme, we have no hesitation in saying that Gelb's plan to defraud the Postal Service falls within the purview of the mail fraud statute. Here, the mails were used in a scheme or artifice that involved misrepresentations and was meant to defraud the U.S. Postal Service of revenue. In *United States v. Starr*, 816 F.2d 94 (2d Cir.1987), the facts underlying an alleged mail fraud were nearly identical to the mail-burying scheme employed by Gelb. There, we reversed the conviction for mail fraud, which was based on charges of cheating customers of a mailing service who had received the services for which they had paid, but we indicated that had the government "charge[d] specifically a scheme to defraud the postal service," mail fraud would have been established. *Id.* at 97 n. 4; *see id.* at 102 (Newman, J., concurring).

■■■■ Gelb suggests that stealing postage is similar to the deprivation of intangible rights described in *McNally* and so cannot constitute mail fraud. Gelb, however, is not charged with implementing a scheme to defraud anyone "of their intangible rights," *McNally*, 483 U.S. at 355, 107 S.Ct. at 2879; *see* Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, § 7603(a), 102 Stat. 4181, 4508 (1988) (post-*McNally* amendment of 18 U.S.C. § 1346 to include within definition of "scheme or artifice to defraud" a plot to deprive someone of intangible right to honest services), but with depriving the Postal Service of postage, which has demonstrable value and in which the Postal Service has a property right. The defect in the mail fraud conviction challenged in *McNally* was that "there was no charge and the jury was not required to find that the Commonwealth [of Kentucky] itself was defrauded of any money or property." *McNally*, 483 U.S. at 360, 107 S.Ct. at 2882. Here, the superseding indictment charged that Gelb defrauded the Postal Service.

■■■ Gelb takes issue with the court's instruction to the jury that "[i]t is not necessary that ... the United States Postal Service[ ] actually suffered any loss. The ultimate success of the scheme is not an element of the crime...." He contends that it is an essential element of the crime that the defrauded party be deprived of

money. The challenged instruction is a correct statement of the law; pecuniary injury to the victim of the fraud is not required. *United States v. King*, 860 F.2d 54, 55 (2d Cir.1988) (per curiam), *cert. denied*, ─── U.S. ───, 109 S.Ct. 2062, 104 L.Ed.2d 628 (1989).

■ That Gelb alternatively could have been charged under other criminal statutes, namely 18 U.S.C. § 1725 (1982), which criminalizes "deposit[ing] any mailable matter ... on which no postage has been paid ... with intent to avoid payment of lawful postage," and 18 U.S.C. § 501 (1982), which criminalizes "forg[ing] or counterfeit[ing] any ... postage meter stamp, or any stamp printed upon ... any die, plate, or engraving," does not render prosecution under the mail fraud statute improper. The rule of lenity, *see McNally*, 483 U.S. at 359–60, 107 S.Ct. at 2881–82; *United States v. Evans*, 844 F.2d 36, 42 (2d Cir.1988), mandates no different result.

### 3. *Bribery*

■ The bribery statute, 18 U.S.C. § 201, applies to any person who "corruptly gives ... anything of value to any public official ... with intent ... to induce such public official ... to do or omit to do any act in violation of the lawful duty of such official." *Id.* § 201(b)(1)(C). Gelb suggests that a postal employee is not a "public official." The statute defines a public official to include "an employee or person acting for or on behalf of the United States ... in any official function, under or by authority of any ... department, agency, or branch of Government." *Id.* § 201(a)(1). We have no doubt that the postal employees whom Gelb bribed were "acting for the United States in an official function," *Krichman v. United States*, 256 U.S. 363, 365, 41 S.Ct. 514, 515, 65 L.Ed. 992 (1921). They were responsible for ensuring that bulk-paid mail of private mailers had proper documentation reflecting payment and, if it did not, that it be further processed and its postage verified. Thus, the postal employees held "position[s] of public trust with official federal responsibilities," *Dix-*

*son v. United States*, 465 U.S. 482, 496, 104 S.Ct. 1172, 1180, 79 L.Ed.2d 458 (1984).

■ As well, and despite Gelb's contention, the evidence was sufficient to sustain the convictions. John Krikorian and Thomas Geraghty, two of the arrested postal employees, testified that although at first they considered the money they received as tips, they eventually became suspicious because "the money started to get bigger," and EDP was the only mass mailer to deposit sacks of mail without proper documentation. The return address on an envelope containing bribe money and turned over by Krikorian to the government was that of an EDP subsidiary, and the defense stipulated that the envelope bore Gelb's handwriting. Certainly, "after reviewing the evidence in the light most favorable to the prosecution, [a] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

### 4. *RICO*

■ The RICO conviction is well-grounded. Because we have determined that conviction on the mail fraud and bribery counts are proper, there are many acts of racketeering, i.e. all the instances of meter tampering, mailing and bribing. *See, e.g., Beauford v. Helmsley*, 865 F.2d 1386, 1392 (2d Cir.) (in banc) ("each act of fraudulent mailing is separately indictable"), *vacated and remanded*, ─── U.S. ───, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). Together these acts constitute the required pattern. "[T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, ─── U.S. ───, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). The relatedness element is present; with each of his schemes Gelb sought to cheat the Postal Service by not paying the appropriate postage. *See United States v. Indelicato*, 865 F.2d 1370, 1381–84 (2d Cir.1989) (in banc). The requirement of continuity is satisfied;

the schemes were conducted for about five years, and but for their discovery surely would have continued. *See H.J.*, 109 S.Ct. at 2902.

 Gelb argues also that the prosecution did not distinguish between the defendant, Gelb, and the enterprise, EDP. He complains that the prosecution averred in a letter to the court that "Gelb *is* EDP," and at trial stated that "Gelb was, in fact, EDP." In a section 1962(c) prosecution, the named RICO defendant and the alleged enterprise cannot be the same; they must be separate entities. *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). However, here the superseding indictment identified Gelb as the defendant and "EDP and its subsidiaries and affiliates" as the enterprise. "[T]he indictment plainly alleged as a RICO enterprise a business entity that was distinct from [Gelb]." *United States v. Weinberg*, 852 F.2d 681, 684 (2d Cir.1988). In fact, the district court instructed the jury that to convict Gelb on the RICO charge, it had to find that EDP was an enterprise. As to the government's two assertions of the unity of identity between Gelb and EDP, they were simply to show that severance of EDP's trial from Gelb's trial was inappropriate and that the government should be allowed to introduce against EDP evidence that was used against Gelb.

#### 5. *Simanowitz' Testimony*

 Gelb contends that the district court should have declared a mistrial once Simanowitz testified during the government's case-in-chief about money Gelb had paid to employees of the Bronx–Lebanon Hospital. Normally, similar act evidence that is offered for purposes of intent "should await the conclusion of the defendant's case.... This enables the trial judge to determine whether the issue sought to be proved by the evidence is really in dispute...." *United States v. Colon*, 880 F.2d 650, 660, (2d Cir.1989) (quoting *United States v. Figueroa*, 618

F.2d 934, 939 (2d Cir.1980)). However, because the court originally had ruled that the evidence could be introduced in the government's rebuttal, Gelb actually benefitted from the judge's ultimate refusal to let the evidence in at all. Furthermore, the one reference to the Bronx–Lebanon Hospital "payoffs" was cured by a limiting instruction. Any error suggested by the Simanowitz testimony can only be depicted as harmless.

#### 6. *Voir Dire*

 A district court has "very broad discretion as to how much, and what, is to be asked of prospective jurors." *United States v. Anagnos*, 853 F.2d 1, 5 (1st Cir. 1988). The court in *Anagnos* adopted the standard developed in *United States v. Baldwin*, 607 F.2d 1295 (9th Cir.1979). In *Baldwin*, the court observed:

> All circuits appear to be in agreement that the refusal to ask the question of whether the prospective jurors would be unduly influenced by the testimony of a law enforcement officer does not always constitute reversible error; that question hinges upon such factors as the importance of the government agent's testimony to the case as a whole; the extent to which the question concerning the venireperson's attitude toward government agents is covered in other questions on voir dire and on the charge to the jury; the extent to which the credibility of the government agent-witness is put into issue; and the extent to which the testimony of the government agent is corroborated by non-agent witnesses.

*Id.* at 1298.

In *Anagnos*, upon which Gelb relies, the First Circuit treated as reversible error the trial judge's refusal to ask prospective jurors a question similar to the one requested by the defense here, because the agent in charge of Anagnos' investigation was the government's first witness, his testimony occupied 100 pages of transcript and he sat at counsel's table throughout the trial. *Anagnos*, 853 F.2d at 4. However, applying the *Baldwin* standard to the facts of this case demonstrates that if the district

court committed an error by not questioning jurors about the influence of official testimony, it was harmless. Each of the several Postal Service inspectors and the one Internal Revenue Service agent who were witnesses in this case gave brief testimony. The district court properly charged the jury in regard to assessing the credibility of law enforcement witnesses. As well, the credibility of most of the official witnesses was not subject to extensive challenge. Finally, the incriminating testimony that detailed Gelb's criminal activities was given by Gelb's accomplices, not law enforcement officials.

### 7. Remaining Contentions

We have considered Gelb's remaining contentions and find them to be meritless.

### CONCLUSION

The judgment of the district court is affirmed.