UNITED STATES of America,
Plaintiff–Appellee,

v.

Earl Wayne NASH,
Defendant–Appellant.

No. 88–5991.

United States Court of Appeals,
Eleventh Circuit.

Sept. 5, 1990.

Arthur W. Tifford, P.A., Miami, Fla., for defendant-appellant.

Dexter W. Lehtinen, Lewis P. Carey, Jr., Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before JOHNSON, Circuit Judge, HILL * and HENLEY **, Senior Circuit Judges.

HENLEY, Senior Circuit Judge.

Earl Wayne Nash appeals a judgment of conviction and sentence for conspiring and attempting to import cocaine in violation of 21 U.S.C. §§ 952(a), 963 (1988). We affirm his conviction but vacate his sentence and remand for new sentencing.

I.

Shortly before dark on April 16, 1988, United States Customs Service aircraft began monitoring Nash's airplane off the southwestern Florida coast. Nash's airplane was flying at an altitude of ten to thirty feet—low enough to leave a wake in the water. According to government testimony, drug smugglers commonly fly at low altitudes to avoid detection by radar. Also, Customs Service pilots testified that the United States government does not maintain a permanent radar facility on the southwestern Florida coast, which makes that area a popular passage for drug smugglers.

Nash's airplane crossed the coast and flew towards Fort Lauderdale at an altitude of around fifty feet above the trees. About twenty-five miles east of Fort Lauderdale, the aircraft began to gain altitude

* *See* Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

while heading for Homestead, Florida, near Miami. The airplane appeared ready to land at the Homestead General Airport, but then flew past the airport in a southerly direction.

The Customs Service aircraft followed Nash to Cay Sal Bank, which is part of the Republic of the Bahamas and about one hundred miles south of Homestead. It was now too dark to see Nash's aircraft. However, the Customs Service aircraft were equipped with "forward-looking infrared radar" ("FLIRR"), which "sees" and "videotapes" objects by sensing temperature variations in the area being monitored. The FLIRR indicated that bundles were being dropped into the ocean from Nash's airplane as it circled over Cay Sal Bank. No lights on Nash's aircraft were on, and the FLIRR was unable to detect the contents of the falling objects. A later search of area failed to produce evidence of any jettisoned packages, but the Customs Service pilots testified that this was not unusual, given the altitude from which the bundles were dropped (3,000 feet) and the size of the area over which the airplane circled (two miles).

After circling Cay Sal Bank, Nash's airplane returned to the Homestead General Airport. The lights on the aircraft came on as it approached the airport. When Nash landed Customs Service officials were waiting to arrest him and his passenger, Frank Maguire. Nash was read his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked if he would answer questions. He responded that he understood his rights and did not wish to make a statement. A Customs Service officer indicated the defendant's refusal on a "warning card" and refrained from further questioning.

Richard Cunicelli, the Customs Service case agent, arrived about an hour later and met Nash. After discussing the situation with Jack Hawley, one of the Customs Service pilots, Cunicelli searched Nash's aircraft. Seized from the airplane and later introduced at trial were navigational charts depicting routes to and from Colombia, hand-held radios, and papers listing weight displacement calculations that used 2.2 pounds (one kilogram) as a unit of measure. Also, the aircraft was equipped with "bladder tanks," fuel drums to extend its flying range. In addition, seats had been removed from the aircraft, which, according to Cunicelli, is common in airplanes used for drug smuggling. No trace of any controlled substance was found on board.

The government's account of what happened next differs substantially from that of the defendant. Agent Cunicelli stated that after he completed the search, Nash approached him and said that he wanted to speak with him and "do the right thing" but did not wish to talk in front of Maguire. Cunicelli and Hawley then took Nash to a quonset hut at the airport away from the others. Both of the government agents testified that, in their presence, Nash signed a form waiving his *Miranda* rights after those rights had been re-read to him by Cunicelli. Hawley then left the room, leaving Nash and Cunicelli by themselves. According to Cunicelli, the defendant next asked what the agent could do for him, and Cunicelli replied that he would make his cooperation known to the United States Attorney's office, and that although he could not guarantee a reduced sentence, generally "individuals [who] cooperated in investigations fared better time-wise" than those who did not. At that point, again according to Cunicelli, Nash confessed that on the previous day he had flown from Florida to Colombia, that he had met someone in Colombia named "Raphael," that he had waited for cargo in the company of other planes, and that his cargo had consisted of approximately ten duffel bags of marijuana or cocaine. Later Nash allegedly admitted that the duffel bags had contained only cocaine. According to Cunicelli, Nash said that he had jettisoned his cargo over Cay Sal Bank after learning that he was being followed. In addition, Nash allegedly said that he had smuggled drugs on two previous occasions.

Nash strongly disputes Cunicelli's description of their encounter. Although Hawley testified that he saw Nash and Cunicelli talking with each other beside Nash's aircraft, the defendant points out

that no witness corroborated Cunicelli's testimony that Nash initiated the interview. The defendant also contends that the government did not rebut or contradict a police officer's testimony that the defendant remained in a police car with the windows rolled up until the Customs Service agents removed him to the quonset hut. Finally Nash points out that no one besides Cunicelli witnessed his alleged confession. The defendant essentially argues that Cunicelli simply obtained Nash's signature on an "ambiguous" acknowledgement form, so that the agent could later use that form as evidence that Nash had waived his rights and confessed.

After a grand jury indicted him, Nash made a pre-trial motion to suppress statements that he allegedly made to Cunicelli. The court denied the motion. The jury found Nash guilty of one count of conspiracy and one count of attempt to import cocaine. Nash was sentenced to twenty consecutive years of confinement on each count.

II.

Nash first contends that the district court erred in denying his motion to suppress Cunicelli's testimony concerning the defendant's alleged confession.

In the context of a motion to suppress, the district court's findings of fact will be upheld unless they were clearly erroneous, *e.g., United States v. Newbern,* 731 F.2d 744, 747 (11th Cir.1984), but the application of the law to those facts is subject to de novo review, *e.g., Adams v. Balkcom,* 688 F.2d 734, 739 (11th Cir.1982). We construe the facts in the light most favorable to the party who prevailed below. *E.g., United States v. Baron-Mantilla,* 743 F.2d 868, 870 (11th Cir.1984) (per curiam).

Nash argues that the district court erred in holding that his alleged statements to Cunicelli were voluntarily made. Both the government and the defendant agree that at the time of his arrest Nash told Customs Service officials that he did not wish to make a statement. Thus, our inquiry into whether the defendant later acted voluntarily is guided by *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), which dealt with the voluntariness of a confession that came after the defendant initially informed police of his desire to remain silent. In holding that the confession was voluntarily made, the *Mosley* Court rejected the argument that *Miranda* creates a "*per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id.* at 102–03, 96 S.Ct. at 325–26. Rather, the *Mosley* Court concluded, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. at 326.

The evidence introduced at the suppression hearing supports a finding that the Customs Service officials scrupulously honored Nash's right to cut off questioning and that Nash knowingly and intelligently waived his right to remain silent. When the defendant first indicated that he did not wish to make a statement, the officials ceased questioning him and left him alone inside a police vehicle. Cunicelli's questioning of Nash did not take place until over an hour later and, according to Cunicelli, only at the defendant's request. Although Nash disputes Cunicelli's testimony that the defendant initiated the encounter and knowingly waived his rights by signing the waiver form, we are unable to conclude that the district court was clearly erroneous in believing Cunicelli's version of events.

The defendant further contends that his statements were involuntary because of illegal inducements. We find that the district court was not clearly erroneous in accepting Cunicelli's testimony that he only promised to make Nash's cooperation known to the United States Attorney's office and gave no guarantee of a reduced sentence. Although Cunicelli told Nash that cooperating defendants generally "fared better time-wise," this statement did

not amount to an illegal inducement: "telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government." *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978).

Nash also argues that there was insufficient corroboration of Cunicelli's testimony. In order to admit this testimony into evidence, other evidence must "support[ ] the essential facts admitted sufficiently to justify a jury inference of their truth." *Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954). We conclude that independent evidence—testimony concerning the evasive and erratic maneuvering of Nash's airplane; the navigational charts depicting routes to and from Colombia; the weight displacement calculations utilizing 2.2 pounds (one kilogram), a common unit for measuring cocaine; the bladder tanks; the removed airplane seats; and the FLIRR videotape of bundles being jettisoned from Nash's airplane—provided sufficient corroboration for the testimony to be admitted into evidence.

III.

The defendant's next contention is that the district court committed reversible error by not asking three voir dire questions concerning whether the veniremen would tend to believe a law enforcement officer's testimony merely because of his position as a police official.[1] He argues that the government's heavy reliance upon testimony of law enforcement officials required that these questions be given.

The district court has wide discretion in determining which questions are asked during voir dire. *See Rosales–Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (opinion of White, J.); *Wilcox v. Ford,* 813 F.2d 1140, 1150 (11th Cir.), *cert. denied,* 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987). As the judicial official who presides over voir dire, the district judge "must scrutinize not only spoken words but also gestures and attitudes of all participants to ensure the jury's impartiality." *Gomez v. United States,* — U.S. —, 109 S.Ct. 2237, 2247, 104 L.Ed.2d 923 (1989). Because of its immediate contact with the voir dire proceeding, the district court is in a far superior position to evaluate particular voir dire questions than is the court of appeals, which can only rely on the cold record in conducting its review. *See United States v. Hurley,* 746 F.2d 725, 727 (11th Cir.1984). *See generally Gomez,* 109 S.Ct. at 2247 ("[O]nly words can be preserved for review; no transcript can recapture the atmosphere of the *voir dire*....").

Even if the district court failed to ask particular voir dire questions that may be warranted in the case, we will find no abuse of discretion if the voir dire questioning as a whole complied with "the essential demands of fairness," that is, if it gave reasonable assurance to the parties that any prejudice of the potential jurors would be discovered. *See United States v. Tegzes,* 715 F.2d 505, 507 (11th Cir.1983).

1. The proposed questions were as follows:

3. Do you know any person who works for the United States Attorney, the Drug Enforcement Administration, the United States Customs Service, or any other federal, state or local law enforcement agencies? If so, please state whether your acquaintance with that person would cause you to give greater weight to the testimony of a witness who was a law enforcement officer solely due to the witness' position.

4. If a witness who is a law enforcement officer gives testimony in this case that conflicts with or contradicts the testimony of a witness who is not a law enforcement officer, would you be inclined to believe the former's testimony over the latter's simply because the former is a law enforcement officer? Generally speaking, are you inclined to believe as true what a police officer might say due solely to his or her position?

5. Generally speaking, are you inclined to disbelieve what a person who is accused of a crime might testify to in his defense solely because he is the defendant? In addition, if the testimony given by a law enforcement agent conflicts with the defendant's testimony, would you be inclined to believe the former and disbelieve the latter solely because the former is a police officer?

Our evaluation of whether the district court acted within its discretion is guided by two cases of the former Fifth Circuit regarding voir dire inquiry into a potential juror's predisposition towards law enforcement officers' testimony. *See United States v. Gassaway,* 456 F.2d 624 (5th Cir. 1972) (per curiam); *United States v. Jackson,* 448 F.2d 539 (5th Cir.1971), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 750, 30 L.Ed.2d 775 (1972).[2]

The defendant in *Jackson,* who was charged with obstruction of the mails, requested the following voir dire question:

> Are you more apt to believe the testimony of an official of the Post Office Department, solely because he is an official of the Post Office Department, than you are to believe the testimony of the Defendant?

Holding that the district court did not err in refusing to give this question, the *Jackson* panel noted that the lower court had asked the potential jurors whether any of them were employed in law enforcement, whether any were aware of personal bias or prejudice in connection with the case, and whether they could be fair and impartial jurors. *See id.* at 542. Also crucial to the panel's reasoning was that

> [i]n a comprehensive charge to the jury, the [district] [j]udge covered the recognized rules for weighing and evaluating the testimony of witnesses. Specifically, the judge charged that the jurors could consider the relationship a witness bears to the [g]overnment as affecting his credibility, and that the defendant's testimony was to be treated according to the same standards that apply to the testimony of other witnesses.

*Id.* The court of appeals concluded that "any possible harm from the failure to ask the question was totally cured by the instruction of the [district] [c]ourt, the last thing the jurors heard before they retired to consider their verdict." *Id.* at 543.

In *Gassaway* the defendants, who were being prosecuted for moonshining whiskey primarily on the basis of government agents' testimony, requested that the district court ask if there was "any [prospective] juror who would believe the testimony of a law enforcement officer in preference to other testimony for the sole reason that the testimony was given by a law enforcement officer." 456 F.2d at 625 n. 2. Finding no abuse of discretion in the district court's failure to ask this question, the *Gassaway* panel noted that the prospective jurors were asked whether they had any prejudice or bias toward the defendants, whether they were completely impartial between the government and the defendants, whether any were acquainted with the officers who were to testify, whether any had an immediate family member who was a police officer, and whether any had been or were presently a police officer. *See id.* at 626. The court of appeals also commented that

> the court below properly instructed the jury on the recognized rules for weighing and evaluating testimony, including cautioning the jurors to consider each witness' testimony without prejudice and to take into consideration the witness' interest in the outcome.

*Id.*

Turning to the case at bar, we find facts that are analogous to those present in *Jackson* and *Gassaway.* As did the district courts in *Jackson* and *Gassaway,* the trial judge here questioned each prospective juror regarding potential bias in favor of either the government or the defendant. Also as in *Jackson* and *Gassaway,* the district court asked the veniremen whether they, their friends, or their family were employed in law enforcement. And as did the trial court in *Gassaway,* the district

2. A previous Eleventh Circuit panel has noted that *Jackson* and *Gassaway* govern our review of a district court's decision not to question prospective jurors regarding their attitudes towards law enforcement officers' testimony. *See United States v. Vadino,* 680 F.2d 1329, 1336–37 (11th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). *See generally Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) (holding that all Fifth Circuit cases decided before the close of business on September 30, 1981, are binding on the Eleventh Circuit).

court asked whether any of the prospective jurors were acquainted with the law enforcement officials who were to testify.[3]

In a fashion similar to the trial courts in *Jackson* and *Gassaway,* the district court "covered the recognized rules for weighing and evaluating the testimony of witnesses" in its jury charge, *see Jackson,* 448 F.2d at 542, and gave the following instruction that the testimony of a law enforcement official was not to be given preference over that of a lay witness merely because of the official's position of authority:

> Now, you've heard testimony of government agents, customs, drug enforcement, et cetera. The testimony of government agents is to be subjected to the same tests and given the same consideration as that of any other witness. No more and no less weight is to be given their testimony simply because of their official capacity with the government. Everyone, government agent and lay witnesses are judged and treated the same way.

More importantly, not only did the district court give an instruction regarding the weight of government testimony at the *end* of the trial, but also, unlike the courts in *Jackson* and *Gassaway,* the district court here gave the following admonition *during voir dire* concerning the proper weight to be given law enforcement officers' testimony vis-a-vis that of lay witnesses:

> Now, as the government has already indicated, the majority or all of its witnesses who will be called in this case will be government agents. That is, federal law enforcement agents.
>
> I tell you now, and I will tell you later, that their testimony must be measured and judged like any other witness. They get no more credibility or believability on your part because they are government agents or because they have a badge.
>
> On the other hand, they get no less credibility because of the fact that they are employed in an official government capacity.
>
> All witnesses, defendant's and government agents, are to be judged and measured in the same capacity by you as jurors.
>
> Do anyone of the jurors have a problem with that instruction?

Given the striking similarity between the case at bar and *Jackson* and *Gassaway,* as well as the additional safeguards against jury bias present here that were not in either of those cases, we are reluctant to conclude that the district court erred in failing to ask the questions submitted by the defendant.

In arguing that an abuse of discretion warranting reversal occurred, Nash relies upon the language of Judge, later Chief Justice, Burger in *Brown v. United States,* 338 F.2d 543, 545 (D.C.Cir.1964):

> [W]hen important testimony is anticipated from certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested.

Judge Burger added that "[f]ailure to make appropriate inquiry, when requested, does not necessarily require reversal; the issue turns on the degree of impact which the testimony in question would be likely to have had on the jury and what part such testimony played in the case as a whole." *Id.*

This language might suggest that the district court's failure to give the defendant's proffered inquiries on voir dire constitute reversible error merely upon a showing that the prosecution relied heavily upon law enforcement officers' testimony. However, later circuit court decisions have not fully adopted this view. As a Ninth Circuit panel noted in *United States v. Baldwin,* 607 F.2d 1295 (9th Cir.1979), whether the district court committed reversible error depends not only on "the importance of the government agent's tes-

3. The court below, in fact, went further in its questioning than did the district courts in *Jackson* and *Gassaway* by also asking whether any of the veniremen were members of organizations concerned with the criminal justice system.

timony to the case as a whole," but also on such factors as

> *the extent to which the question concerning the venireperson's attitude toward government agents is covered in other questions on voir dire and on the charge to the jury;* the extent to which the credibility of the government agent-witness is put into issue; and the extent to which the testimony of the government agent is corroborated by non-agent witnesses.

*Id.* at 1298 (emphasis added); *accord United States v. Gelb,* 881 F.2d 1155 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989); *United States v. Anagnos,* 853 F.2d 1 (1st Cir.1988); *cf. United States v. Espinosa,* 771 F.2d 1382, 1405 & n. 30 (10th Cir.) (citing *Gassaway* and *Jackson* for the proposition that "courts have held that refusal to ask the question [of propensity to believe law enforcement officers' testimony] does not amount to an abuse of discretion when the trial judge adequately covers the issue in other questions and in his charge to the jury"), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985).

Here, although the government depended heavily upon the testimony of Agent Cunicelli and other law enforcement officers in making its case, we conclude that other factors—specifically, the district court's other voir dire questions and its jury charge—suggest that the district court did not abuse its discretion by refusing to ask the questions requested by Nash. In any event, we conclude that the district court's other admonitions to the jury render harmless any error resulting from its failure to ask the defendant's proffered questions.

## IV.

Nash also argues that the following jury instruction concerning the voluntariness of his statement to Agent Cunicelli, was deficient:

> It is for you to decide (1) whether the defendant made the statement; (2) whether the statement was freely and voluntarily made; and (3) if so, how much weight, if any, you wish to give to it. In making those decisions you should consider all of the evidence about the statement, including the total circumstances under which the Defendant may have made it.

The defendant contends that the district court should have instructed the jury to disregard his confession if the jury found it to have been made involuntarily.

The giving of jury instructions regarding confessions is governed by 18 U.S.C. § 3501(a) (1988).[4] Several circuits have said that this statute codified the so-called "orthodox procedure" to the giving of these instructions. *See, e.g., United States v. Curtis,* 568 F.2d 643, 647 n. 4 (9th Cir. 1978); *United States v. Barry,* 518 F.2d 342, 346 n. 5 (2d Cir.1975); *United States v. Panepinto,* 430 F.2d 613, 618 n. 15 (3d Cir.), *cert. denied,* 400 U.S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256 (1970); *see also United States v. Robinson,* 439 F.2d 553, 575 (D.C. Cir.1970) (McGowan, J., dissenting); 2 C. Wright, Federal Practice and Procedure § 414, at 513 (1982). The orthodox procedure has been described as follows:

> [O]nce the judge makes the preliminary finding of voluntariness, the jury does not make another independent finding on that issue. Under this procedure, the jury only hears evidence on the circumstances surrounding the confession to aid it in determining the *weight* or *credibility* of the confession....

*United States v. Robinson,* 439 F.2d at 575 (McGowan, J., dissenting); *see also, e.g., Jackson v. Denno,* 378 U.S. 368, 378, 84 S.Ct. 1774, 1781, 12 L.Ed.2d 908 (1964).

4. This statute provides the following:

> In any criminal prosecution brought by the United States or by the District of Columbia, a confession shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made, it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

The alternative to the orthodox procedure advanced by Nash is the so-called "Massachusetts procedure," which requires that both the judge and the jury make separate findings of voluntariness before the jury can consider the confession as evidence in the case. *See, e.g., id.; Robinson,* 439 F.2d at 575 (McGowan, J., dissenting)

The instruction given in this case resembled the instruction mandated by the Massachusetts procedure because the charge stated that the jury must determine "whether the statement was freely and voluntarily made." However, the instruction here did not tell the jury to disregard the statement if it found that the statement was not voluntarily made, as required by the Massachusetts procedure.

We conclude that the district court did not reversibly err in declining to give the complete instruction mandated by the Massachusetts procedure. Although it may be arguable that other circuits are incorrect in concluding that 18 U.S.C. § 3501(a) "codified" the orthodox procedure,[5] we certainly can agree this statute does not require a judge to follow in full the Massachusetts procedure. Since the instruction given in this case afforded Nash at least as much protection as would the orthodox instruction, error, if any, in the instruction given would be harmless beyond a reasonable doubt. Moreover, since the Supreme Court has implicitly indicated that the orthodox instruction does not violate due process, *see Jackson v. Denno,* 378 U.S. at 378–79, 84 S.Ct. at 1781–82, the instruction here complied with due process requirements as well.

## V.

Because Nash's offenses were committed after November 1, 1987, the district court erred in not sentencing him pursuant to the Sentencing Guidelines. *See generally United States v. Burgess,* 858 F.2d 1512, 1513–14 (11th Cir.1988) (noting that Guidelines apply to offenses committed after November 1, 1987). We thus must remand for new sentencing under the Guidelines.

## VI.

The defendant's other contentions have been examined and found to be without merit. We affirm the defendant's conviction but vacate his sentence and remand for further sentencing proceedings not inconsistent with this opinion.

HILL, Senior Circuit Judge, dissenting:

I dissent, and write separately in order to express my disagreement with the majority's conception of the appropriate scope of *voir dire.* In my view, the majority's opinion erodes the very premise of our jury system, namely, the "selection of jurors who at least have an open mind about the case." *Batson v. Kentucky,* 476 U.S. 79, 89 n. 12, 106 S.Ct. 1712, 1719 n. 12, 90 L.Ed.2d 69 (1986).

The issue of *voir dire*—and its treatment in our courts—has always reflected basic notions of due process, fair play and the jury's role in a complex society:

> Our civilization has decided, and very justly decided, that determining the guilt or innocence of men is a thing too important to be trusted to trained men. If it wishes for light upon that awful matter, it asks men who know no more law than I know, but who can feel the things I feel in a jury box. When it wants a library catalogued, or the solar system discovered, or any trifle of that kind, it uses up

5. None of the authorities that say that 18 U.S.C. § 3501(a) mandates the orthodox view explain how or why that conclusion is reached. *See, e.g., Curtis,* 568 F.2d at 647 n. 4; *Barry,* 518 F.2d at 346 n. 5; *Panepinto,* 430 F.2d at 618 n. 15. It appears plausible to hold the view that while the statute mandates a determination by the judge of voluntariness, it does not forbid the judge from following the Massachusetts procedure of allowing the jury to make a voluntariness determination as well where fact questions are critical. In any event, detailed discussion of the differences between the orthodox and Massachusetts procedures appears to be somewhat logomachic. Whether the jury is instructed to disregard the confession if it is involuntary (as under the Massachusetts procedure) or is told to weigh the confession in light of its voluntariness (as under the orthodox procedure), the jury remains free to ignore the confession entirely in its deliberations.

its specialists. But when it wishes anything done that is really serious, it collects twelve of the ordinary men standing about.[1]

G.K. Chesterton (attributed). The function of *voir dire,* or the examination of potential jurors, is, as Chesterton notes, to "collect[ ] twelve of the ordinary men [and, in this century, women] standing about," and organize them into an impartial jury, with no substantial biases regarding the outcome of a case.

This attitude towards *voir dire* has not always been standard. In the twelfth century, in England, during the reign of Henry II, the jury was essentially a body of neighbors, who rendered a verdict of guilt or innocence (apparently more often guilt) based on their own knowledge of the facts. *See, e.g.* C. Rembar, *The Law of the Land: the Evolution of Our Legal System,* 129 (1980). If jurors lacked personal knowledge of a dispute, they prepared for jury service by informing themselves on the subject before appearing in court. *See, e.g.* L. Moore, *The Jury: Tool of Kings, Paladium of Liberty,* 39 (1973) (hereinafter *The Jury*). Since courts assumed that jurors had personal knowledge of the truth of the facts in dispute, they could hold jurors guilty of perjury for rendering a false verdict. Moore, *The Jury,* 43. Twelfth century jurors did not weigh evidence; instead, they transported their *own* perceptions of the evidence—and with it, the threat of bias, self-interest, and intimidation by authority—into the courtroom.

Early scholars traced the source of the modern jury to Magna Carta, but "[h]istorians no longer accept this pedigree." *Duncan v. Louisiana,* 391 U.S. 145, 151 n. 16, 88 S.Ct. 1444, 1448 n. 16, 20 L.Ed.2d 491 (1968). Well into the fourteenth century, members of the accusing jury (today's Grand Jury) continued to sit on the trial panel. Moore, *The Jury,* 56. By 1305, however, an established system for peremptory challenges arose. *See* The Ordinance for Inquests, 33 Edw. 1, Stat. 4 (1305), (providing that if "they that sue for the King will challenge any ... Jurors, they shall assign ... a Cause certain.") By 1352, a statute permitted challenges to petit juries on the ground that they had participated as "indicators" on the accusing jury. *See* 25 Edw. 3, Stat. 5, Ch. 3. By a series of complicated steps, therefore, the jury system slowly evolved, until by "the 14th and 15th centuries, the jury became an impartial trier of facts, owing in large part to [the] development in that period, allowing challenges." *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 506, 104 S.Ct. 819, 822, 78 L.Ed.2d 629 (1984).[2] By the eighteenth century, William Blackstone could write that "the founders of the English law have, with excellent forecast, contrived that ... the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion." 4 W. Blackstone, *Commentaries on the Laws of England,* 349–350 (Cooley ed. 1899).

In this century and in this country, our Supreme Court has reminded us that "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639,

1. Apparently not all commentators share Chesterton's views. I hope that the following remarks by Samuel Clemens, alias Mark Twain, merely reflect that author's celebrated sense of humor:

> "The jury system puts a ban upon intelligence and honesty, and a premium upon ignorance, stupidity, and perjury. It is a shame that we must continue to use a worthless system because it was good a thousand years ago."

2. By the sixteenth century, common challenges to jurors included the following causes: (1) in a criminal case, the juror had served on the grand jury which indicted the defendant, (2) the juror was a serf or servant, (3) a previous court had convicted the juror of certain crimes, (4) the juror was related to a litigant or to the sheriff, (5) the juror had a civil action pending against one of the parties, (6) a particular outcome in the case would benefit the juror in some way, or (7) the juror had already served as an abitrator in the matter, or in some fashion had already declared his opinion. Moore, *The Jury,* 69.

1642, 6 L.Ed.2d 751 (1961). The Supreme Court has also commented that:

> '[O]ur common-law heritage, our Constitution, and our experience in applying that Constitution have committed us irrevocably to the position that the criminal trial has one well-defined purpose—to provide a fair and reliable determination of guilt.' (citation omitted). That purpose simply cannot be achieved if the jury's deliberations are tainted by bias or prejudice. Fairness and reliability are assumed only if the verdict is based on calm, reasoned evaluation of the evidence presented at trial. Thus, time and time again, in a broad variety of contexts, the Court has adopted strong measures to protect the right to trial by an impartial jury.

*Smith v. Phillips,* 455 U.S. 209, 225, 102 S.Ct. 940, 950, 71 L.Ed.2d 78 (1982) (Marshall, J., dissenting).

I review this history today to remind myself and others that the origins of our modern conception of *voir dire* has a respectable lineage, but not an ancient one. Its sources are not shrouded in the mists of time; they are not, in the words of Mark Twain, "a thousand years old." Indeed, if this tortuous, but triumphant, history means anything, it may merely be that progress can come slowly, in unexpected flashes, or by stages and degrees.

In the case before us now, only one question, in the final analysis, required resolution by a jury: Did the appellant admit, at the scene of his arrest, that the items thrown from his aircraft contained contraband? One witness testified that Nash made such an admission, although others present did not hear him do so. That witness was a law enforcement officer, occupying an official position in a hazardous and well-publicized war on drugs.

I submit that in our society there exist many people—honest, well-motivated, fair, good people—who would, if asked, acknowledge a tendency to believe the sworn statement of a law enforcement officer simply because that officer held such a position of trust. In a well-ordered society, that tendency can be a natural one; it is certainly not an evil one. It is also, however, an inclination of great interest and importance to a defendant who asserts that an officer's testimony is unreliable, unfair, or unworthy of belief.

Appellant's defense depended upon his ability to persuade the jurors that they should not credit the testimony of a certain law enforcement officer. In the eyes of many, that defense rested on a slender reed indeed, but that reed was all that Nash had to sustain him. The district court should have permitted Nash to discover, through *voir dire,* which of the prospective jurors would harbor biases against him, or in favor of the officer.

As the majority's opinion notes, the language of Judge, later Chief Justice, Burger, acknowledged the importance of ascertaining these tendencies in an early opinion:

> [W]hen important testimony is anticipated from certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, *a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested.*

*Brown v. United States,* 338 F.2d 543, 545 (D.C.Cir.1964) (emphasis supplied). Judge Burger continued, however, that "[f]ailure to make appropriate inquiry, when requested, does not necessarily require reversal; the issue turns on the degree of impact which the testimony in question would be likely to have had on the jury, and what part such testimony played in the case as a whole." *Brown,* 338 F.2d at 545.

As I have already observed, here the "part [the] testimony played in the case as a whole" was, in fact, the government's entire case against Nash. That same testimony, moreover, also implicated Nash's entire defense. I can conceive of few cases presenting a "degree of impact which the testimony in question would be likely to have had on the jury" greater than the impact involved in *this* one. Thus, as the Seventh Circuit has held under similar circumstances, "it was particularly important for the defendant to know of any preju-

dices the jurors may have had about the government or about the credibility of government agents." *United States v. Martin*, 507 F.2d 428, 432 (7th Cir.1974).

Today the majority holds, however, that the district court adequately compensated for its rejection of the proposed questions by informing the jurors that they should "measure and judge [Nash's] testimony like any other witness, and that includes witnesses called by the government." As the majority notes, the court also asked the jurors, as a group, whether "any of the jurors seated here have a problem with those principles of law." However:

> Mere admonitions ... are not enough. The sole purpose of voir dire is not to tell potential jurors that they are to be fair and then ask them if they think they can be impartial. The defendant's proposed questions were meant to elicit specific attitudes and prejudices. We cannot assume that a juror would state that he could not be impartial merely because he had a close relationship with the government or a high regard for the credibility of government agents. *Such questions should have been asked directly.*

*Martin*, 507 F.2d at 432–33 (emphasis supplied). Questions such as the ones defense counsel proposed are especially critical in cases, such as this one, which consist chiefly of the testimony of law enforcement officers. *See, e.g. United States v. Espinosa*, 771 F.2d 1382, 1405 (10th Cir.1985), *cert. den. sub nom. Foreman v. United States*, 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985).

In this case, the judge admonished the jurors to "judge [Nash's] testimony like any other witness," and then asked the jury, as a group, whether "any ... have a problem with those principles of law." The majority's opinion suggests that this inquiry compensated for the judge's failure to question jurors individually. In *my* view, however, the district judge's instructions amounted to a mere admonition that the jurors should be fair. As I perceive it, the judge's function was not merely to instruct the jurors, but to supervise a dialogue that would have enabled the defen-

dant to learn which panel members would find it difficult to follow those instructions. That, in fact, is why we have *voir dire.* The procedure, or dialogue, rarely uncovers disqualifying *facts*, but it often discloses interesting and even critical predilections, tendencies, pastimes and beliefs, all of which may become the salvation—or downfall—of a defendant's case.

In short, the questions sought by Nash were not only brief, but useful; they would have bolstered the jurors in their efforts to approach the task before them "at least [with] ... an open mind." *Batson*, 476 U.S. at 89 n. 12, 106 S.Ct. at 1719 n. 12. "[A]n open mind" is a modern phrase which suggests a modern sensibility; early juries, whose members had also composed the "accusing" jury, and who shared a first-hand knowledge of the disputed facts, would have found the concept alien indeed. In this age, however, we vigorously promote the concept of the *impartial* tribunal as central to our conception of due process. I would require district courts to implement simple questions which enable counsel to fashion a jury that approaches the modern ideal—a body of unbiased individuals, strangers to a dispute, who evaluate facts with respect for, but without slavish adherence to, the testimony of those in authority.

The inquiry sought by Nash was pertinent and important. The district court should have permitted it. I would reverse.