UNITED STATES of America,

v.

Philip FRUCHTER, Steven Fruchter, Lawrence Braun, Dauda Yague, a/k/a "Cheik," Mamadou Sylla, Mitchell Grand, Miguel Mercedes, Samba William, Muninauth Pulchan, a/k/a "Ramish," and Frank Singh, Defendants.

No. 99 CR 366 (DAB).

United States District Court, S.D. New York.

July 11, 2000.

Benjamin Brafman, New York City, for Defendant Stephen Fruchter.

Austin V. Campriello, Robinson, Silverman, Pearce, Aronsohn & Berman LLP, New York City, for Defendant Philip Fruchter.

Don D. Buchwald, New York City, for Defendant Lawrence Braun.

Maurice H. Sercarz, New York City, for Defendant Dauda Yague.

William J. Stampur, New York City, for Defendant Mamadou Sylla.

Robert Kalina, New York City, for Defendant Mitchell Grand.

Frank A. Ortiz, Brooklyn, NY, for Defendant Miguel Mercedes.

Daniel J. Nobel, New York City, for Defendant Samba William.

Peter K. Wilson, New York City, for Defendant Muninauth Pulchan.

Arthur J. Viviani, New York City, for Defendant Frank Singh.

Mary Jo White, United States Attorney for Southern District of New York, New York City, of counsel, Alexander H. Shapiro, Kevin S. Reed, Assistant United States Attorneys.

## MEMORANDUM & ORDER

BATTS, District Judge.

Defendants are charged in a forty-four (44) count Indictment with racketeering, conspiracy, mail fraud, and numerous other offenses. Defendants now move for various forms of relief.

## I. THE INDICTMENT

On April 13, 1999, the Government filed a forty-four (44) count Indictment charging Defendants with racketeering, conspiracy, mail fraud, and numerous other offenses. Defendants are ten principals, owners and employees of a mail sorting company called American Presort, Inc. ("API").

Counts One and Two charge each of the Defendants with violating the substantive and conspiracy provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, based on their involvement in alleged mail fraud schemes against the United States Postal Service ("USPS") and clients of API, as well as acts of bribery of USPS employees, in violation of 18 U.S.C. § 1962(c). Count Three charges each of the Defendants with conspiracy to commit mail fraud, postage meter fraud, false statements and bribery, in violation of 18 U.S.C. §§ 1341, 501, 1001 and 201. Counts Four through Fifteen charge each of the Defendants with mail fraud against the USPS in violation of 18 U.S.C. §§ 1341 and 1342. Count Sixteen charges Defendants Steven Fruchter ("Steven Fruchter"), Philip Fruchter ("Philip Fruchter") and Lawrence Braun ("Braun") with postage meter fraud in vio-

lation of 18 U.S.C. §§ 501 and 502. Count Seventeen charges Steven Fruchter with postage meter fraud in violation of 18 U.S.C. §§ 501 and 502. Counts Eighteen through Twenty–Eight charge each of the Defendants with making false statements in violation of 18 U.S.C. §§ 1001 and 1002. Count Twenty–Nine charges Steven Fruchter, Philip Fruchter and Braun with mail fraud against API clients in violation of 18 U.S.C. §§ 1341 and 1342. Counts Thirty through Forty–Four charge Steven Fruchter, Philip Fruchter, Braun and Dauda Yague ("Yague") with bribery of Postal Service employees in violation of 18 U.S.C. §§ 201 and 202. The Indictment also contains a forfeiture allegation against Defendants Steven Fruchter, Philip Fruchter and Lawrence Braun.

## II. DISCUSSION

Defendants move for various forms of relief. Defendant Steven Fruchter seeks to dismiss Counts One and Two on the grounds that the Counts fail to allege a "pattern of racketeering activity" as required by 18 U.S.C. § 1962. Defendants Mamadou Sylla ("Sylla"), Miguel Mercedes ("Mercedes"), Samba William ("William"), Muninauth Pulchan ("Pulchan") and Frank Singh ("Singh") also seek dismissal of Counts One and Two on the grounds that they did not participate in the operation, management or direction of the alleged substantive or conspiracy racketeering violations. Defendants Braun, Mercedes, Pulchan and Singh move to dismiss Count Four alleging that it is duplicitous. Defendants Mercedes and Singh seek dismissal of Counts Five through Fifteen on the grounds that these Counts fail to allege sufficiently the fundamental mailing component of 18 U.S.C. § 1341. For the same reason, Defendant Singh seeks dismissal of Counts Thirteen through Twenty–Three. Defendant Pulchan seeks to dismiss Counts Eighteen through Twenty–Eight on the grounds of multiplicity. Defendant Singh moves to dismiss these same Counts, alleging they constitute an *ex post facto* violation. Defendant Braun seeks to dismiss Count Twenty–Nine on the ground that it is duplicitous.

Defendants Philip Fruchter, Yague and Pulchan seek to suppress all physical evidence obtained through searches of API. In addition, Defendant Philip Fruchter requests a *Franks* hearing on the reliability of the information provided to the Magistrate Judge at the time of the application of the search warrants. The Defendants also request a suppression hearing, alleging that the warrants were overbroad, the postal inspectors went beyond the scope of the warrant and that the second warrant was the fruit of the poisonous tree of the first warrant.

Defendant Yague seeks suppression of his post-arrest statements on the grounds that he was not advised of his *Miranda* rights until after custodial interrogation began, that he did not understand the rights when they were eventually given and thus he did not validly waive his rights, and that his statements were involuntary. Defendant Yague also requests a suppression hearing.

Defendants Sylla, Mitchell Grand ("Grand"), Mercedes, William, Pulchan and Singh all seek severance from Defendants Steven Fruchter, Philip Fruchter, Braun and Yague. Defendants argue that they should not be prejudiced from the spillover of the evidence against these four principal defendants and that Defendant Yague gave a statement which implicates each of them. In the alternative, Defendants argue that the Counts against them should be severed from the Counts in which they are not named.

Defendants Braun, Grand, Sylla, and William seek various forms of discovery including bills of particulars, *Brady* material and 404(b) material. Defendant Grand also seeks the preservation of the rough notes of Government agents and early production of Jencks Act material.

Finally, each Defendant joins in the motions of his co-Defendants to the extent such action is beneficial.

A. Motions to Dismiss

1. Counts One and Two

Count One alleges substantive racketeering violations against all of the Defendants. (Indictment ¶¶ 1–12.) Count Two incorporates Count One by reference, and alleges that each of the Defendants "agreed that a conspirator would commit at least two of the acts of racketeering in the conduct of the affairs of the enterprise." (Indictment ¶ 15.)

Defendant Steven Fruchter moves for dismissal of Counts One and Two of the Indictment, for failure to allege a "pattern of racketeering activity" as required by 18 U.S.C. § 1962. Defendants Sylla, Mercedes, William, Pulchan and Singh also seek dismissal of Counts One and Two on the grounds that they did not participate in the operation, management or direction of the alleged substantive or conspiracy racketeering violations, as required in *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).

a. Pattern of Racketeering

The crux of Stephen Fruchter's argument is that the alleged predicate acts, when viewed in the context of API's day-to-day operations, constitute "no more than a handful of isolated acts that account for a minuscule percentage of the business of API." (Stephen Fruchter Mem. at 8.) Thus, Stephen Fruchter argues, they are "no more than sporadic activity." (Stephen Fruchter Mem. at 2–10.)

■ "Review of a criminal RICO indictment ... is governed by Rule 7(c)(1) of the Federal Rules of Criminal Procedure, which only requires that the indictment be a plain, concise and definite written statement of the essential facts constituting the offense charged." *United States v. Reale*, No. 96 Cr. 1069, 1997 WL 580778 at *5, (S.D.N.Y. Sept.17, 1997) (internal quotations omitted). "An indictment need only provide a defendant with sufficient notice to permit him to defend against the charges and to bar future charges that

may place him in double jeopardy." *United States v. Wang*, No. 98 Cr. 0199, 1998 WL 556160 at *1, (S.D.N.Y. Aug.31, 1998) (citing *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) and *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.1975)).

A "pattern of racketeering activity" has three components: 1) at least two predicate acts of racketeering activity within ten years of one another; 2) interrelatedness of the predicate acts; and 3) the predicate acts reveal "continued, or the threat of continued, racketeering activity." *United States v. Diaz*, 176 F.3d 52, 93 (2d Cir.1999).

■ The relatedness component may be satisfied by pleading predicate acts that have "the same or similar purposes, results, participants, victims, or methods of commission." *Id.* Further, "[t]wo [predicate] ... acts that are not related to each other may nevertheless be related indirectly because each is related to the RICO enterprise." *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir.1992) (internal quotations omitted).

■ "The continuity prong of a RICO pattern 'is both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'" *Diaz*, 176 F.3d at 93 (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)). Closed-end continuity may be demonstrated by "a series of related predicates extending over a substantial period of time." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999) (in context of civil RICO, closed-end continuity shown when predicate acts occur over period of two or more years). The continuity prong also may be satisfied by showing open-end continuity; for open-end continuity, the predicate acts need not extend over a substantial period of time, but there must be "a threat of continuing crim-

inal activity beyond the period during which the predicate acts were performed." *Id.*

■ Here, it is clear that Count One of the Indictment has sufficiently alleged a pattern of racketeering activity. The Indictment alleges fifty-one (51) predicate acts occurring between approximately June 1994 and June 14, 1997. (Indictment ¶¶ 6–12.) Relatedness is also sufficiently pled, as all of the predicate acts are alleged to have the same purpose and results, namely, defrauding of the USPS and certain clients of API. Further, the acts are alleged to have been committed by many of the same Defendants, and are grouped in the Indictment according to methods of commission. *See United States v. Gelb*, 881 F.2d 1155, 1163 (2d Cir.1989) (relatedness in criminal RICO satisfied where each of defendant's schemes "sought to cheat the [United States] Postal Service by not paying the appropriate postage;" acts included burying unpaid mail beneath layers of metered, paid mail, use of stolen postage meter, tampering with postage meters, and bribery of USPS employees).

The alleged predicate acts span three years, thus closed-end continuity is sufficiently pled. The nature of the alleged predicate acts suggests that open-end continuity is also sufficiently pled, since a jury could infer that similar acts would have continued but for the intervention of law enforcement. *See Gelb*, 881 F.2d at 1163–64 (continuity satisfied in criminal RICO when predicate acts continued over five years and "but for their discovery surely would have continued").

Accordingly, Stephen Fruchter's motion to dismiss Counts One and Two, for failure to plead sufficiently a pattern of racketeering activity, is hereby DENIED.

### b. The *Reves* Test

Defendants Mercedes, Pulchan, Singh, Sylla and William also move to dismiss Counts One and Two pursuant to *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), asserting that they did not participate in the operation or management of the enterprise or play a part in directing the enterprise's affairs.[1] (*See, e.g.,* Singh Mem. at 1–2; Sylla Mem. at 1–6.)

Specifically, Singh asserts that a defendant must be alleged to have a managerial or operational role in the operation of the enterprise in order to be subject to RICO liability, (Singh Mem. at 1–2), and that the RICO charges against Singh allege only aiding and abetting liability, not substantive RICO or RICO conspiracy. (*Id.* at 2.) Pulchan, Sylla and William assert that, notwithstanding Sylla's title as "production manager" and Pulchan's job description as a "night shift manager," their duties were "strictly ministerial" and "involved almost no exercise of discretion at all." (Sylla Mem. at 5; Pulchan Notice of Motion ¶¶ 12–13; Ltr. from Daniel Nobel, Esq., dated Dec. 21, 1999, at 1–2, 3.) In addition to the foregoing arguments, Mercedes asserts that he is only one of the technicians who worked with the Bell & Howell mail sorting machines. (Mercedes Mem. at 6–8.)

The provision of the RICO statute under which the Defendants are charged in Count One provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). In interpreting this provision, the Supreme Court, in *Reves*, 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), held that to "participate ... in the conduct of the enterprise's affairs, one must participate in the operation or man-

---

**1.** With the exception of Braun, Stephen Fruchter, and Philip Fruchter, who were principals and owners of API, the Court has considered the motion to dismiss pursuant to *Reves* as to all of the other Defendants.

agement of the enterprise." The Supreme Court noted that while "RICO liability is not limited to those with primary responsibility for the enterprise's affairs ... some part in directing the enterprise's affairs is required." *Id.* at 179, 113 S.Ct. 1163. The Supreme Court also held that the word "participate," as used in the RICO statute, was more restrictive than the phrase "aid and abet," which encompasses all assistance rendered by works, acts, encouragement, support, or presence. *Id.* at 178, 113 S.Ct. 1163.

However, if any conclusion may be drawn from the plethora of post-*Reves* decisions, it is only "that the commission of crimes by lower level employees of a RICO enterprise *may* be found to indicate participation in the operation or management of the enterprise but does not compel such a finding." *United States v. Allen,* 155 F.3d 35, 42 (2d Cir.1998) (emphasis in original).

As the Court has already noted, an indictment is legally sufficient "when it charges a crime (1) with sufficient precision to inform the defendant of the charges he must meet and (2) with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *Reale,* 1997 WL 580778 at *5 (citing *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992)).

Upon thorough examination of Counts One and Two of the Indictment, the Court finds Counts One and Two to be legally sufficient. Both Counts sufficiently track the language of the RICO statute and set forth the time and place of the alleged crimes. (*See, e.g.,* Indictment ¶¶ 2, 14.) The allegations in both Counts adequately "inform the defendant[s] of the charges [they] must meet" and provide them with enough detail to enable them to plead double jeopardy in any future prosecution based on the same events. *Stavroulakis,* 952 F.2d at 693. Indeed, the Indictment

lists fifty-one predicate acts with specific dates for each of those acts.

Defendants' arguments that the *Reves* test cannot be met, are premature. Defendants argue that the Indictment is legally insufficient because the Government will not be able to establish that they were involved in the operation or management of the enterprise. What the Defendants appear to be challenging is not the sufficiency of the Indictment, so much as the adequacy of the evidence upon which the Indictment is based. *See, e.g., United States v. Elson,* 968 F.Supp. 900, 905 (S.D.N.Y.1997) (noting difference between sufficiency of indictment and adequacy of evidence to support the charges).

However, it is well established that an indictment that is valid on its face, such as the Indictment here, may not be dismissed on the ground that it is based on inadequate or insufficient evidence. *See Reale,* 1997 WL 580778 at *6 (collecting cases). Any challenge to the sufficiency of the evidence should be made pursuant to Rule 29 of the Federal Rules of Criminal Procedure. *See United States v. Harris,* 805 F.Supp. 166, 172 (S.D.N.Y.1992), *aff'd,* 79 F.3d 223 (2d Cir.1996) (denying pretrial motion to dismiss indictment on ground that evidence was insufficient and stating that close of Government's case was appropriate time for such a motion); *see also United States v. Payden,* 613 F.Supp. 800, 809 (S.D.N.Y.) *aff'd,* 768 F.2d 487 (2d Cir. 1985) (it is "well established that a facially valid indictment ... may not be challenged on the ground that it was based on inadequate evidence."). Accordingly, Defendants' motion to dismiss Counts One and Two for failure to satisfy the *Reves* test is DENIED.

### 2. Count Four and Count Twenty–Nine

Defendants Braun, Pulchan and Singh move to dismiss Counts Four and Twenty–Nine on grounds that they are duplicitous.[2]

---

2. Defendant Singh erroneously states that Count Four is "multiplicitous." (Singh's Mem. at 3.) "A multiplicitous indictment ...

is one that charges in separate counts two or more crimes, when in fact and law, only one crime has been committed." *United States v.*

Specifically, Count Four charges a violation of 18 U.S.C. § 1341, mail fraud, alleging that "millions of letters" that were sent for mailing "were not accounted for on the Mailing Statements and Qualification Reports." (Indictment ¶ 24.) Count Twenty–Nine also charges a violation of 18 U.S.C. § 1341 against Defendants Braun, Philip Fruchter, and Stephen Fruchter for mailing of an unspecified number of "billing invoices which misrepresented the amount of mail that had been mailed on clients' behalf and the postage paid to the Postal Service in connection with those mailings." (Indictment ¶ 34.) Since each use of the mails in furtherance of a scheme to defraud is a separate crime, Defendants argue that Counts Four and Twenty–Nine, each of which describes more than one use of the mails, are invalid.

■ "An indictment is duplicitous if it joins two or more distinct crimes in a single count." *United States v. Aracri,* 968 F.2d 1512, 1518 (2d Cir.1992). The prohibition against duplicitous indictments serves the following policy considerations:

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.

*United States v. Margiotta,* 646 F.2d 729, 733 (2d Cir.1981) (internal citations omitted).

■ However, "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *Aracri,* 968 F.2d at 1518. Further, an indictment may allege "in a single count

that ... the defendant committed [the offense] ... by one *or more* specified means." Fed R. Cr. P. 7(c)(1) (emphasis added).

■ The policy considerations regarding duplicitous indictments "suggests that a single count of an indictment should not be found impermissibly duplicitous whenever it contains several allegations that could have been stated as separate offenses ... but only when the failure to do so risks unfairness to the defendant." *Margiotta,* 646 F.2d at 733 (stating that risk of unfairness is "slight" in case of mail fraud "where the essence of the alleged wrong is the single scheme to defraud and the various mailings, though they are technically acts that violate the federal statute, are really the jurisdictional bases for federal prosecution"). *See also United States v. King,* No. 98–CR–91A, 2000 WL 362026 at *24 (W.D.N.Y. Mar.24, 2000) (denying motion to dismiss on alleged duplicity of mail and wire fraud); *United States v. Gordon,* 990 F.Supp. 171, 178 (E.D.N.Y. 1998) (finding multiple transactions and acts alleged in one count of money laundering permissible and not duplicitous; defendant had notice of charges against him and could ascertain scope of double jeopardy); *United States v. Brewer,* 768 F.Supp. 104, 105 (S.D.N.Y.1991) (two acts of credit card fraud could be charged in single count of indictment as part of single scheme to defraud).

■ Upon review of the Indictment, the Court finds that Counts Four and Twenty–Nine as alleged will not prejudice the Defendants, as both the acts charged in both Counts are plainly alleged as part of a single scheme to defraud for each Count. To the extent that any of the policy considerations enumerated in *Margiotta* are implicated here, such concerns may be addressed through a bill of particulars or an appropriate instruction to the

*Holmes,* 44 F.3d 1150, 1153–54 (2d Cir.1995). Even if it were a logical possibility to have a single count be multiplicitous, it is clear from

Singh's argument that he seeks dismissal of Count Four on grounds that it is duplicitous. (Singh's Mem. at 3.)

jury. *Brewer,* 768 F.Supp. at 106 (bill of particulars or jury instruction may be used to address potentially duplicitous counts).

Accordingly, Defendants' motion to dismiss Counts Four and Twenty–Nine on grounds of duplicity is hereby DENIED as to both Counts.

### 3. Counts Eighteen through Twenty–Eight

#### a. Multiplicity

Defendant Singh argues that Counts Eighteen through Twenty–Eight should be dismissed because they allege eleven instances of criminal conduct where, "[i]n essence, the conduct alleged is a single act." (Singh's Mem. at 6.) Singh relies on *United States v. Molinaro,* 11 F.3d 853 (9th Cir.1993), which dealt with specific language in the bank fraud statute, 18 U.S.C. § 1344, language not present in the statute at issue here, 18 U.S.C. § 1001.

▆▆▆▆ "An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Walsh,* 194 F.3d 37, 46 (citations omitted). "The basic inquiry is whether each offense charged requires proof of a fact which the other does not." *United States v. Reed,* 639 F.2d 896, 905–906 (2d Cir.1981) (internal citations omitted; citing *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

▆▆▆▆ Counts Eighteen through Twenty–Eight charge eleven different instances of false statements, each of which occurred on eleven distinct dates, each in violation of 18 U.S.C. § 1001. In order to obtain a conviction on each of Counts Eighteen through Twenty–Eight, the Government would have to prove that a separate and distinct false statement was made, in violation of 18 U.S.C. § 1001, on each of the dates alleged in the Indictment. Any of the Defendants could be convicted of one of the alleged violations yet be acquitted of another; thus, Counts Eighteen through Twenty–Eight are not multiplicitous. *See United States v. Biaggi,* 675 F.Supp. 790, 799–800 (S.D.N.Y.1987) (multiple violations of same statute may be charged in multiple, separate, counts). Accordingly, Defendant Singh's motion to dismiss Counts Eighteen through Twenty–Eight is hereby DENIED.

#### b. *Ex post facto*

Defendant Singh also argues that Counts Eighteen through Twenty–Eight must be dismissed because they violate the *ex post facto* clause of the Constitution. U.S. Const. art. I, § 9. Singh argues that dismissal is necessary because 18 U.S.C. § 1001 was amended on October 11, 1996, and the Indictment charges Singh with violating 18 U.S.C. § 1001 before and after October 11, 1996, but only tracks the language of 18 U.S.C. § 1001 after its amendment.

Prior to October 11, 1996, the statute read, in pertinent part:

> Whoever, in *any matter within the jurisdiction of any department or agency of the United States* knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes *any* false, fictitious or fraudulent statements or representations, ... or makes or uses *any* false, fictitious or fraudulent statement or entry ...

18 U.S.C. § 1001 (1976) (emphases added) (current version at 18 U.S.C. § 1001 (1999)). After amendment in October 11, 1996, the statute reads, in pertinent part:

> (a) Except as otherwise noted in this section, whoever, in *any matter within the jurisdiction of the executive, legislative or judicial branch of the Government* of the United States, knowingly and willfully—
>
> (1) falsifies, conceals or covers up by any trick ...;

(2) makes any *materially false*, fictitious, or fraudulent statement of representation; or

(3) makes or uses any false writing or document knowing the same to contain any *materially false*, fictitious or fraudulent statement or entry; . . .

18 U.S.C. § 1001 (1999) (emphases added). The Indictment charges, in pertinent part, that the Defendants:

in a matter *within the jurisdiction of the executive branch of the Government of the United States*, unlawfully, willfully and knowingly, would and did falsify, conceal and cover up by trick, scheme and device a material fact, would and did make false, fictitious and fraudulent statements and representations, and would and did make and use false writings and documents knowing the same to contain *materially false*, fictitious, and fraudulent statements and entries . . .

(Indictment ¶ 32, emphases added.)

 "[I]t has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). A statute or amendment violates the *ex post facto* clause if it punishes as a crime an act that was not a crime at the time of its commission, imposes an additional punishment for a crime after it was committed, or deprives a defendant of a defense that was available at the time of the commission of the crime. *Id.* at 52, 110 S.Ct. 2715.

 In tracking the language of 18 U.S.C. § 1001 after its amendment on October 11, 1996, the Court finds that the *ex post facto* clause was not violated. The language of 18 U.S.C. § 1001, as amended, narrows the universe of acts that could constitute a violation, does not impose any additional punishment, and provides an additional defense for the Defendants that was not available at the time the pre-

amendment acts were alleged to have been committed.

Prior to the amendment, the statute punished false statements "in *any* matter within the jurisdiction of *any* department or agency of the United States." 18 U.S.C. § 1001 (1976) (emphases added) (current version at 18 U.S.C. § 1001 (1999)). As amended, 18 U.S.C. § 1001 criminalizes false statements "in any matter within the jurisdiction of the executive, legislative or judicial branch of the United States," (18 U.S.C. § 1001(a)), but makes exceptions for statements by parties and counsel in judicial proceedings, (18 U.S.C. § 1001(b)), and certain matters within the jurisdiction of the legislative branch. 18 U.S.C. § 1001(c). Thus, the amended statute *restricts*, rather than enlarges, the types of matters in which false statements may be criminalized. Further, this change in the statute is irrelevant to the Defendants in this case, as the Indictment specifies that the alleged false statements were made to the executive branch of the United States Government, and the amended form of 18 U.S.C. § 1001 did not change the applicability of the statute to alleged false statements made to the executive branch.

Prior to amendment, 18 U.S.C. § 1001 placed a maximum penalty of a fine of $10,000 or five years' imprisonment, or both. After amendment, 18 U.S.C. § 1001 places a maximum penalty of five years' imprisonment, or a fine of indeterminate amount, or both. In the event that any Defendant were to be convicted for any false statements occurring prior to October 11, 1996, the Court would be limited to a maximum penalty of $10,000, five years' imprisonment, or both.

Prior to amendment, 18 U.S.C. § 1001 criminalized "*any* false, fictitious or fraudulent statements," or "any false writing or document knowing the same to contain *any* false, fictitious or fraudulent statement or entry." 18 U.S.C. § 1001 (1976) (emphasis added). After amendment, only "*materially* false, fictitious or fraudulent"

statements or entries are criminalized. 18 U.S.C. § 1001 (1999). Post-amendment, it is not sufficient for the statements only to be false, fictitious or fraudulent; the Government must prove beyond a reasonable doubt that the statements are *"materially* false, fictitious or fraudulent." 18 U.S.C. § 1001(a)(2)-(3) (1999). Thus, the *ex post facto* clause is not violated, because the October 11, 1996 amendment to 18 U.S.C. § 1001 limited the kinds of acts that would be criminalized, and introduced a materiality element that must be proven by the Government. The amendment to 18 U.S.C. § 1001 neither criminalizes previously innocent behavior, nor imposes additional punishment, nor prevents Defendants from raising all defenses that were available under the previous version of the statute. *Youngblood,* 497 U.S. at 52, 110 S.Ct. 2715.

Accordingly, Defendants' motion to dismiss Counts Eighteen through Twenty–Eight for violation of the *ex post facto* clause is hereby DENIED.

### 4. Counts Five through Fifteen and Racketeering Acts One through Twenty–Three

Defendants Singh and Mercedes also move for dismissal of Counts Five through Fifteen, and Racketeering Acts One through Twenty–Three,[3] for failure to allege sufficiently the fundamental mailing component of 18 U.S.C. § 1341. (Mercedes' Mem. at 8–12; Singh's Mem. at 3–5.)

Defendants Singh and Mercedes argue that the mailing statements and letters "submitted" to the Postal Service were delivered by hand, not sent through the mails, and that the Indictment fails to allege sufficiently "use of the mails" as required by the statute.

Use of the mails need not be an "essential" part of the scheme; "[i]t is sufficient for the mailing to be incident to an essential part of the scheme, ... or a step in the plot." *Schmuck v. United States,* 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time ..." *Id.* at 715, 109 S.Ct. 1443. "[I]t is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue, providing, ... the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act." *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989). Rather, "[t]he question is whether the defendant reasonably foresaw that the mails would be used..." *Id.* at 37.

The central object of the alleged scheme in the case at bar concerns a fraud perpetrated upon the USPS by enabling API to pay less than the required rate for millions of pieces of mail that were sent through the USPS. (*See* Indictment ¶¶ 7, 8, 24.) Upon review of the allegations contained in the Indictment, the Court finds that the Government has sufficiently alleged the mailing element required by 18 U.S.C. § 1341. Paragraph Seven, which relates to Racketeering Acts One through Twelve, clearly states that "Defendants submitted to the Postal Service over a million letters for mailing;" Paragraph Eight, which relates to Racketeering Acts Thirteen through Twenty–Three, alleges that Defendants "placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service;" and Paragraph Twenty–Six, which relates to Counts Five through Fifteen, charges that Defen-

---

**3.** Singh has argued that Racketeering Acts Thirteen through Twenty–Three should be dismissed for failure to allege the fundamental mailing component; Mercedes has argued that Racketeering Acts One through Twenty–Three should be dismissed for failure to allege the fundamental mailing component.

dants "placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service."

Accordingly, Defendants' motion to dismiss Racketeering Acts One through Twenty–Three and Counts Five through Fifteen, for failure to allege use of the mails, is DENIED.

## B. Suppression

### 1. All Physical Evidence

Defendant Philip Fruchter seeks to suppress all physical evidence seized from API pursuant to two search warrants, the first executed on June 27, 1997 (the "June Warrant") and the second on August 1–2, 1997 (the "August Warrant").

#### a. June Warrant: Factual Background

On June 25, 1997, Postal Inspector Thomas Van de Merlen ("Inspector Van de Merlen") submitted an affidavit in support of a search warrant to search the premises of API for various items. The affidavit contained information about the affiant, background information about postage meters and specific information about three particular postage meters. Inspector van de Merlen had been a Postal Inspector, investigating fraud against the Postal Service for twelve years. (Stephen Fruchter Suppression Aff., Ex. 4 ("Van de Merlen Aff.") ¶ 1.) He had previously assisted in numerous searches and seizures for postage meters and mailing records. (*Id.*)

API presorts, meters and brings approximately two million pieces of mail daily, Monday through Saturday, to the Postal Service in New York City for mailing. (Van de Merlen Aff. ¶ 4.) API leases fifteen postal meters, including three mechanical meters leased from Ascom Hasler, an authorized manufacturer of postage meters, bearing meter serial numbers 2504688, 345778 and 355757. (*Id.*) The unique meter serial number is imprinted beneath the postage imprint, thus making it possible to identify which postage meter

was used to place postage on an individual piece of mail. (*Id.* ¶ 5.) Mechanical postage meters contain a sealed unit which encases the printing die and two recording counters, an ascending and descending register. (*Id.* ¶ 6.) The ascending register keeps a running total of all postage printed by the meter. (*Id.*) The descending register reflects the amount of postage remaining on the meter. (*Id.*) In order to add additional postage to the meter, the meter holder "must take the meter to the post office or have it reset by telephone." (*Id.*) Meter holders are required to return malfunctioning meters immediately. (*Id.*) In order to access the meter setting mechanism, it is necessary to break a USPS lead seal and use a manufacturer's key. (*Id.* ¶ 8.) A meter holder must be licensed by the USPS. (*Id.* ¶ 7.) The post office which issued the license maintains a record of both the ascending and descending register readings which are verified at each setting. (*Id.* ¶ 8.) Third-party mailers frequently maintain records and logs that reflect the amount of postage used per meter, the number of pieces processed by the meter and employee work hours. (*Id.* ¶ 9.)

The USPS uses a computer program to generate reports which analyze statistical samples of all mail delivered nationwide. (Van de Merlen Aff. ¶ 10.) The report "projects," based on the statistical data, the number of pieces of mail during a certain time period and the number of pieces of metered mail. (*Id.*) The report also projects the number of pieces metered by individual meters. (*Id.*) This allows the USPS to determine how much postage should be placed on a specific meter based on its projected use. (*Id.*) The report also indicates the actual amount of postage on an individual meter at a given time. (*Id.*)

#### i. *Postage Meter No. 2504688*

In May, 1997, Inspector Van de Merlen reviewed such a report which was generated for the period from about February 1, 1997 through April 25, 1997. (Van de

Merlen Aff. ¶ 11.) This report projected that the amount of mail imprinted by the Ascom Hasler Meter bearing the serial number 2504688 and leased by API was approximately 2,884,000 pieces. (*Id.*) The report projected that based on the projected number of pieces, the imputed revenue from the postage would be $794,000. (*Id.*) The report indicated that for the period from January 6, 1997 through April 25, 1997, $151,000 of postage had been placed on the descending register of Meter 2504688. (*Id.*)

USPS records similarly indicated that for the period of January 6, 1997 through January 30, 1997, $151,000 in postage was placed on Meter 2504688. (Van de Merlen Aff. ¶ 12.) The records also reflected that the last time postage had been added to Meter 2504688 was on January 30, 1997, when an additional $9,000 was added to the amount of postage remaining on the descending meter, "$10.008." [sic] (*Id.*)

From June 4, 1997 through June 16, 1997, Postal Inspectors diverted a percentage of API's mail, looking for mail imprinted from Meter 2504688. (Van de Merlen Aff. ¶ 13.) Based on the diverted sample, Postal Inspectors determined that Meter 2504688 was used to meter approximately 150,000 pieces of mail bearing approximately $333,999.03 in postage. (*Id.*)

On June 10, 11, 12 and 19, 1997, Postal Inspectors observed API trucks leave API and proceed to a U.S. Postal Processing and Distribution Center and drop off mail, which included pieces bearing the imprint from Meter 2504688. (Van de Merlen Aff. ¶ 14, 15.)

ii. *Postage Meter No. 345778*

Review of postal records revealed that on April 19, 1996, approximately $4,000 was added to Ascom Hasler Postage Meter 345778. (Van de Merlen Aff. ¶ 16.) On that date, the ascending register reflected that a total of $168,492 had been previously used in postage. (*Id.*)

On December 19, 1996, according to postal records, agents of Ascom Hasler conducted a required inspection of Meter 345778 at API. (Van de Merlen Aff. ¶ 17.) These inspectors recorded that the amount on the ascending register was $400,859. (*Id.*) This is approximately $225,000 more than should have been reflected, based on the amount of postage previously added in April, 1996. (*Id.*) Inspector Van de Merlen stated that based on his experience, meter tampering or malfunctioning must occur in order for excess postage to be reflected on the meter. (*Id.*)

In May, 1997, the Postal Service sent API a letter informing API that the Postal Service was phasing out all mechanical postage meters, and that the Postal Service had informed API of this in an earlier letter in February, 1997. (Van de Merlen Aff. ¶ 18.) This earlier letter had stated that by March 31, 1997, API should convert its mechanical meters to electronic or digital meters. (*Id.*) The May, 1997 letter indicated that API had taken no action in response to the February, 1997 letter. (*Id.*) The letter explained that because mechanical postage meters were more susceptible to tampering than electronic meters, the Post Office would no longer reset mechanical meters after June 30, 1997. (*Id.*) The letter specified that Meter 345778 would be affected by this change. (*Id.*) Ascom Hasler has no records indicating that API took any action to return or replace Meter 345778. (*Id.* ¶ 19.)

iii. *Postage Meter No. 355757*

Ascom Hasler notified the USPS in May, 1997 that in April, 1997, API returned a postage meter bearing the serial number 355757 to Ascom Hasler, claiming that the meter had malfunctioned. (Van de Merlen Aff. ¶ 20.) Ascom Hasler indicated that the internal components of the meter showed suspicious damage to the numeric wheels that are adjusted to reflect postage amounts. (*Id.* ¶ 21.) In June, 1997, USPS Inspectors inspected Meter 355757 and concluded that "tool marks of

attack" were present on the meter which were consistent with tampering. (*Id.* ¶ 22.)

### iv. *Issuance and Execution of the June Warrant*

On June 25, 1997, United States Magistrate Judge Leonard Bernikow issued a search warrant for the premises of API based on the Van de Merlen Affidavit. The warrant authorized the search and seizure of the following items: (a) Postage Meter 2504688; (b) Postage Meter 345778; (c) "any letter or package bearing imprint of Meter 2504688 or Meter 345778;" (d) "modified base, service plate or other tools and instruments that could be used to access the inner workings of a postage meter;" (e) "rubber stamps bearing the number 2504688 or 345778;" (f) "meter keys or lead seals;" and (g) "logs, books and other records that reflect usage of Meters 2504688 and 345788." (Steven Fruchter Suppression Aff., Ex. 3 ("June Warrant"), at 2.)

The Postal Agents seized the following items pursuant to the June Warrant on June 27, 1997:(1) Ascom Hasler Postage Meters 345778, 2524507, 349797C, and 2504688; (2) Pitney Bowes Postage Meter 918775; (3) two Ascom Hasler meter base plates; (4) a compact tool kit; (5) inspection receipts for meters 345778 and 2504688; (6) meter invoices; (7) postage logs and production reports for all meters; (8) 13 trays of mail with imprints from Meter 2504688; (9) 18 trays of mail labeled "Area 1, GPMC 1;" (10) 14 trays of mail labeled "Area 1, GPMC 2;" (11) 33 trays of mail labeled "Area 1, GPMC 3." (Steven Fruchter Suppression Aff., Ex. 7 ("Search Warrant Inventory Forms").)

### b. The June Warrant: Discussion

Defendant Philip Fruchter seeks a *Franks* hearing and suppression of all of the physical evidence pursuant to the June Warrant, arguing that (1) Magistrate Judge Bernikow, in issuing the warrant, was misled by information in the Van de Merlen Affidavit that Inspector Van de Merlen knew was false or would have known was false except for his reckless disregard of the truth; (2) that Inspector van de Merlen did not have an objectively reasonable basis for believing that the warrant was properly issued; (3) that Magistrate Judge Bernikow abandoned his judicial role in issuing the warrant; and (4) that, in executing the warrant, the inspectors went beyond the scope of the warrant. (Philip Fruchter's Mem. at 4.)

### i. *Probable Cause*

 To suppress evidence, a defendant must show a lack of probable cause to support the issuance of the search warrant. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Hernandez,* 85 F.3d 1023, 1028 (2d Cir.1996). Even if a warrant is not supported by probable cause, it will be upheld unless the defendant can show that the officers who executed the search objectively failed to act in reasonable reliance upon the issued warrant. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Hernandez,* 85 F.3d at 1028.

 In order to determine whether probable cause exists to support issuance of a search warrant, "a judge must determine whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Salameh,* 152 F.3d 88, 112–13 (2d Cir.1998) (citing *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Great deference should be given to a judge's determination that probable cause exists, and the Court should "resolve any doubt about the existence of probable cause in favor of upholding the warrant." *Salameh,* 152 F.3d at 113.

 Inspector Van de Merlen's Affidavit relied on a report generated by a Postal Service computer program projecting the use of specific postal meters, postal records of the postage on specific meters,

inspection of diverted mail, and inspection of a returned "malfunctioning" meter. For Meter 2504688, Inspector Van de Merlen found that it had been used to meter approximately 150,000 pieces of mail, bearing approximately $333,999.03 in postage. (Van de Merlen Aff. ¶ 13.) For the same time period, USPS records indicated that maximum amount of postage available to print from this meter was $9,010.008 [sic]. (*Id.*)

For Meter 345778, Inspector Van de Merlen stated that, based on records indicating the amount of postage that had been added to the meter, that the ascending register should have read no more than $172,501. (Van de Merlen Aff. ¶ 16.) However, on December 19, 1996, the ascending register indicated that Meter 345778 had printed $400,859 of postage, well over the maximum amount that should have been indicated by the ascending register. (*Id.* ¶ 17.)

Ascom Hasler, the manufacturer of the postage meters, informed Inspector Van de Merlen of "suspicious damage" to the value disks of another meter returned to Ascom Hasler from API, (Van de Merlen Aff. ¶ 21), and USPS Inspectors inspected the same meter and concluded that "tool marks of attack" were present on the meter, consistent with tampering. (*Id.* ¶ 22.)

Cumulatively, this evidence provided sufficient probable cause to believe that evidence of a crime could be found at API's premises.

### ii. *Franks hearing*

█ A *Franks* hearing is appropriate only "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *see also United States v. Zagari*, 111 F.3d 307, 321 (2d Cir.1997) ("*Franks*

tells us that evidence obtained by the Government must be suppressed at trial if the Government concealed facts that were material to an informed probable cause determination, and that the defense is entitled to a hearing on this matter if it makes a substantial showing that a false statement was knowingly, intentionally or recklessly included in the warrant affidavit, and that the allegedly false statement was necessary to the finding of probable cause."); *United States v. Campino*, 890 F.2d 588, 592 (2d Cir.1989) (denying request for *Franks* hearing because appellants failed to produce evidence of deliberate falsehood or recklessness in its affidavit, even though agents "turned out to be wrong about who lived in the apartment").

█ Defendants argue that a *Franks* hearing is necessary because Inspector Van de Merlen's Affidavit "reckless[ly]" provided "inaccurate" information to the Magistrate. (Philip Fruchter's Reply Mem. at 13.) Defendants assert, among other unsupported allegations, that Defendants were "set up" by postal inspectors and Ascom Hasler personnel. (*Id.*) This argument is wholly without merit.

Defendants can point to no statement in Inspector Van de Merlen's Affidavit that is untrue; Defendants only point to statements in the Van de Merlen Affidavit which, at best, may have been inaccurate, and omissions of speculative explanations of postage meter inaccuracies. (*See* Philip Fruchter's Reply Mem. at 4–15.)

The Court has reviewed the alleged inaccuracies and omissions and finds them to be immaterial to the finding of probable cause. Even if the alleged inaccuracies and omissions were material, Defendants have made absolutely no showing, much less a "*substantial* showing that a false statement was knowingly, intentionally or recklessly included in the warrant affidavit." *Zagari*, 111 F.3d at 321 (emphasis added).

Accordingly, Defendants' request for a *Franks* hearing is DENIED.

iii. *"Good Faith" Exception*

██ Even if no probable cause existed for the June Warrant, "a motion to suppress will still be denied if the court finds that the officers who conducted the search acted in good faith reliance on a facially valid warrant." *Salameh,* 152 F.3d at 114. Although Defendants have alleged that the Postal Inspectors went beyond the scope of the warrant, they have not alleged that the Postal Inspectors' reliance on the warrant was not in good faith.

██ Evidence seized in good faith pursuant to a defective search warrant may be suppressed only

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (3) where the issuing magistrate abandoned his detached and neutral role; [or] ... (4)where, depending on the circumstances of the particular case, a warrant [is] ... so facially deficient ... that the executing officers cannot reasonably presume it to be valid.

*United States v. Burke,* 718 F.Supp. 1130, 1141 (S.D.N.Y.1989) (internal citations omitted). As discussed above, Defendants have not shown that Magistrate Judge Bernikow was misled, and the Court has determined that the Van de Merlen Affidavit contained sufficient indicia of probable cause.

Defendants also assert, with no proof, that Magistrate Judge Bernikow "abandoned his judicial role and rubber-stamped what was submitted to him." (Philip Fruchter's Mem. at 32.) In attempting to impugn Magistrate Judge Bernikow's determination of probable cause, Defendants argue that Judge Bernikow issued the warrant without probable cause, that the Van de Merlen Affidavit incorrectly relied on 18 U.S.C. § 501, and that the warrant incorrectly referred to 18 U.S.C. § 510 rather than 18 U.S.C. § 501. (*Id.* at 33–34.) Defendants' arguments are utterly lacking in merit.

Based upon the Court's own examination of the Van de Merlen Affidavit, the Court has determined that probable cause existed to issue the June Warrant. 18 U.S.C. § 501 proscribes the making or printing of "any postage stamp, postage meter stamp, stamped envelope, or postal card ... without the special authority and direction of the [USPS]," and thus clearly covers the conduct alleged in the Van de Merlen Affidavit. 18 U.S.C. § 501; *see also* Gov.'s Mem. at 72. Finally, a typographical error in the warrant itself, referring to 18 U.S.C. § 510 instead of 18 U.S.C. § 501, is immaterial and does not require the extreme sanction of suppression or reversal of the warrant. *See, e.g., United States v. Lee,* No. 92 Cr. 954, 1993 WL 51100 at *2–*3 (S.D.N.Y.1993) (innocent technical error on face of warrant not sufficient to invalidate warrant); *United States v. Skinner,* 972 F.2d 171, 177 (7th Cir.1992) (typographical error substituting "5" for "S" in identification number was "so minor as to be inconsequential"); *United States v. Longo,* 70 F.Supp.2d 225, 251–52 & n. 5 (W.D.N.Y. 1999) (typographical error in transcription of file names failed to constitute evidence of improper execution of warrant).

As a final matter, Defendants have not alleged, and there is no indication whatsoever, that the June Warrant was so facially deficient that the executing officers could not reasonably presume it to be valid. Accordingly, Defendants' motion for suppression of evidence seized pursuant to the June Warrant is DENIED.

iv. *Scope of the June Warrant*

Defendants also assert that the Inspectors went beyond the scope of the search warrant, seizing three additional postage meters, Ascom Hasler invoices, trays of mail, daily postage logs covering 1992 and 1993, and conducting a general exploratory

search of the premises. (Philip Fruchter's Mem. at 35–41.)

The Government asserts, and the Defendants do not contest, that the Ascom Hasler invoices and trays of mail are "letter[s] or package[s] bearing imprint [sic] of Meter 345778 or Meter 2504688" or "[l]ogs, books and other records that reflect usage of Meters 2504688 and 345778." (June Warrant at 2.) The Government has also conceded that the "postage logs from 1992 and 1993 do not appear to fall within the scope of the [June Warrant]." (Gov.'s Mem. at 74.) If indeed the postage logs bear no relation to the meters listed in the June Warrant, the Court expects the Government to return them to Defendants. If, however, there is an independent basis for admissibility of the postage logs, nothing in this Memorandum and Order shall be construed to limit the admissibility of such documents.

Defendants also assert that three postage meters seized during the search and not named in the June Warrant, should be suppressed; the Government argues that the meters were properly seized under the plain view exception to the warrant requirement. (Gov.'s Mem. at 74–75.)

■■■ A motion to suppress does not require a hearing unless there is a factual dispute. *United States v. Pena*, 961 F.2d 333, 339 (2d Cir.1992) ("[a]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question"); *United States v. Restrepo*, No. 95 Cr. 225, 1995 WL 494012 at *1 (S.D.N.Y. Aug.17, 1995). "To create a factual dispute, defendant must submit sworn factual allegations from an affiant with personal knowledge." *United States v. Urena–Pere*, No. 91 Cr. 946, 1992 WL 17977 at *1 (S.D.N.Y. Jan.24, 1992). In the absence of an affidavit of anyone with personal knowledge, an evidentiary hearing is unnecessary. *Id; see also United States v. Viscioso*, 711

F.Supp. 740, 745 (S.D.N.Y.1989) ("The required showing must be made by an affidavit of someone with personal knowledge of the underlying facts"), *aff'd*, 923 F.2d 842 (2d Cir.1990); *United States v. Gregory*, 611 F.Supp. 1033, 1044 (S.D.N.Y.1985) ("[defendant] has failed to raise a factual issue concerning the validity of the seizure and is not entitled to a suppression hearing. The movant having failed to meet his initial burden making specific factual allegations of illegality, the motion to suppress the evidence seized pursuant to the search warrant is ... denied").

■■■ Defendants' argument for suppression of the three additional meters is based on their assertion that the Government found Meters 2504688 and 345778 prior to finding the additional meters, and therefore the Government had no reason to continue searching for more postage meters. (Philip Fruchter's Reply Mem. at 19–21.) Defendants have submitted an affidavit from Steven Fruchter in support of their argument that the additional meters were found after the Government found Meters 2504688 and 345778; however, Steven Fruchter admits that the affidavit is not based on personal knowledge, since he was not present at either search. (Steven Fruchter Reply Aff. ¶ 2.) Defendants' "belief" that the additional meters were found after Meters 2504688 and 345778, in the absence of an affidavit from an individual with personal knowledge of the underlying facts, is simply insufficient to create a factual dispute requiring a suppression hearing. Accordingly, Defendants' motion to suppress evidence seized pursuant to the June Warrant is DENIED in its entirety.

c. August Warrant

Defendant Philip Fruchter alleges that the August warrant is the fruit of the poisonous tree of the June warrant and thus if the June warrant is found to be invalid, the evidence seized pursuant to the August warrant must also be suppressed.

Because the Court has determined that the June warrant was valid, the August warrant is also valid, and Defendants' motion to suppress the evidence seized pursuant to the August Warrant is also DENIED.

### 2. Yague's Post–Arrest Statements

Defendant Yague argues that his post-arrest statements made on April 14, 1999 must be suppressed because: (1) he was not advised of his *Miranda* rights until after custodial interrogation had begun; (2) he did not understand the rights when they were given and did not validly waive his rights; and (3) the statements were involuntary.

The Government concedes that Defendant Yague's affidavit is sufficient to require an evidentiary hearing regarding the admissibility of Yague's post-arrest statements. (Gov.'s Mem. at 108.) Accordingly the parties are directed to appear on August 7, 2000 at 11:30 a.m. for a suppression hearing.

### C. Severance

Defendants Grand, Mercedes, Pulchan, Singh, Sylla, and William, (collectively, the "Severance Defendants"), move for severance from Defendants Stephen Fruchter, Philip Fruchter, Laurence Braun, and Dauda Yague under Rules 8 and 14 of the Federal Rules of Criminal Procedure. In the alternative, Defendants Sylla and Singh moves for severance of the Counts in which they are not named.

### 1. Standards Governing Severance

■ Rule 8(b) applies to cases where there is both a joinder of offenses and parties. *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir.1988). Joinder of defendants and counts is proper where the criminal acts of two or more persons 1) are unified by some substantial identity of facts or participants or 2) arise out of a common plan or scheme. *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir.1990). Rule 14 permits a district court to sever the joinder if prejudice would result from a joint trial.

■ Defendants seeking severance have a difficult standard to meet:

There is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. . . .'

We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. . . .

When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials. Rules 8(b) and 14 are designed 'to promote economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial.'

*Zafiro v. United States*, 506 U.S. 534, 537–40, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (citations omitted); *see United States v. Rosa*, 11 F.3d 315, 341 (2d Cir.1993) (indicating that defendant bears a heavy burden to secure a reversal and "must show prejudice so severe that his conviction con-

stituted a miscarriage of justice"; that there is a preference for joint trials; and finally, evidence that would have been admitted at an individual trial does not constitute prejudicial spillover in the joint trial); *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir.1993) (to prove spillover prejudice defendant must show a miscarriage of justice).

■■■ The decision of whether to sever is left to the sound discretion of the Court. *See, e.g., Locascio*, 6 F.3d at 947; *United States v. Lasanta*, 978 F.2d 1300, 1306 (2d Cir.1992) (severance is committed to the sound discretion of the court and is "virtually unreviewable").

### 2. Severance of Defendants

No Defendant has argued that he was improperly joined; instead, the Severance Defendants argue, at best, that they are alleged to have minor roles, and should be severed on prejudice grounds. (Singh's Mem. at 7; *see also* Kalina Affirm. (Severance) at 9–10;[4] Mercedes' Mem. at 13–15; Pulchan's Mem. at 10–13; Sylla's Mem. at 7–8; William's Ltr. of Dec. 21, 1999, at 2.) The Severance Defendants also assert that Yague provided a post-arrest statement which incriminates each of them, resulting in "overwhelming" prejudice. (Kalina Affirm. (Severance) at 5–8; *see also* Mercedes' Mem. at 15–16; Pulchan's Mem. at 8–10; Singh's Mem. at 8; Sylla's Mem. at 8.)

■■■ The Court does not find that prejudice to the Severance Defendants would be so substantial as to warrant severance. Differing levels of culpability and proof are insufficient grounds for severance. *United States v. Chang An–Lo*, 851 F.2d 547, 557 (2d Cir.1988); *Locascio*, 6 F.3d at 947. Even though there are some Counts which do not name all ten Defendants, all ten Defendants are named in Counts 1–15 and Counts 18–28 (substantive racketeering, racketeering conspiracy,

conspiracy, mail fraud, mail fraud against the USPS, false statements). "[I]t is sometimes said that a particularly strong showing is required to obtain severance in a conspiracy case ... on the theory that persons who were partners in crime cannot object to being partners at the trial." 1 Charles Alan Wright, Federal Practice and Procedure (Criminal) §. 226 (2d ed.1982) (citations omitted) (noting "great faith in the ability of the court by suitable instructions to cure any prejudice and to guide the jury through the complex proof in a long and complicated case"). The Severance Defendants have not shown, much less alleged, that a jury would be unable to compartmentalize the evidence as to each Defendant. Again, the efficiency of prosecuting all counts and all Defendants together outweighs the possibility of prejudice.

■■■ With respect to Yague's post-arrest statements, the Court first notes that a suppression hearing has been scheduled for August 7, 2000, at 11:30 a.m. Thus, it is possible that one reason for the Severance Defendants' request could be eliminated. Even if Yague's post-arrest statements are not suppressed, the Court finds that severance is not warranted because Yague's statements could be redacted to eliminate any reference to the Severance Defendants' names and existence. *See Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) ("We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his existence.")

Finally, any prejudice that might result from trying the Severance Defendants alongside Defendants Stephen Fruchter, Philip Fruchter, Braun and Yague could

---

4. In support of Grand's motions, his attorney, Robert Kalina, filed several separate Affirmations, each addressed to a separate request.

Thus, motion papers filed by Grand are cited as "Kalina Affirm (Request)" or "Grand Mem. (Request)."

be cured by a limiting instruction. *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. For these reasons, the Court DENIES Defendants Grand, Mercedes, Pulchan, Singh, Sylla and William's request for severance.

### 3. Severance of Counts

■ The Severance Defendants' request for a severance of the Counts in which they are not named, is similarly without merit. All ten Defendants are charged in a total of twenty-five (25) Counts, which include racketeering, RICO conspiracy, conspiracy, mail fraud, and false statements. All ten Defendants worked at API, and all of the acts charged in the Indictment relate to API's business.

Moreover, an understanding of the nature of API's business is necessary for an understanding of all of the Counts in the Indictment. *See United States v. Turoff,* 853 F.2d 1037, 1044 (2d Cir.1988) (finding joinder of mail-fraud and tax-fraud counts proper in multi-count, multi-defendant case where "proof of one scheme [was] indispensable for a full understanding of the other"). Proof of facts regarding API's operation would require much of the same testimony and evidence presented in a trial for all of the Counts. Accordingly, the Severance Defendants' request for a severance of Counts is also DENIED.

## D. Discovery

Defendants Braun, Grand, Sylla and William have also moved for a Bill of Particulars, disclosure of material pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), disclosure of material pursuant to Fed.R.Evid. 404(b), early production of Jencks Act material, preservation of rough notes of Government agents, and additional discovery requests.

### 1. Bill of Particulars

■ Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, Defendants move for a Bill of Particulars. "Rule 7(f) ... permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.... Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir. 1987); *United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988).

■ "Whether to grant a bill of particulars rests within the sound discretion of the district court." *United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir. 1984). The Second Circuit has "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms." *United States v. Salazar,* 485 F.2d 1272, 1277 (2d Cir.1973) (citing *United States v. Fortunato,* 402 F.2d 79, 82 (2d Cir.1968)). Thus, a "bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres,* 901 F.2d, 205, 234 (2d Cir.1990) (quoting *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd,* 875 F.2d 857 (2d Cir.1989)).

■ A bill of particulars is not meant to be a tool to compel disclosure of the Government's case before trial. *See United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974); *United States v. Nova–Nunez,* No. 96 Cr. 0599, 1997 WL 30965, at *4 (S.D.N.Y. Jan.24, 1997); *United States v. Facciolo,* 753 F.Supp. 449, 451 (S.D.N.Y. 1990). The Government is not required to disclose the manner in which it will attempt to prove the charges, *United States v. Wilson,* 565 F.Supp. 1416, 1438–39 (S.D.N.Y.1983), nor the means by which the crimes charged were committed. *United States v. Andrews,* 381 F.2d 377, 378 (2d Cir.1967). The Government is not

required to provide information that would, in effect, give the Defendant a preview of the Government's case before trial. *United States v. Simon,* 30 F.R.D. 53, 55 (S.D.N.Y.1962).

█ In deciding a motion for a bill of particulars, "[t]he important question is whether the information sought is necessary, not whether it is helpful." *Facciolo,* 753 F.Supp. at 451. The Government has provided the Defendants with a copy of the Indictment and with additional, voluminous discovery that supplements the information provided in Indictment. (Gov.'s Mem. at 118–22.) The Indictment, which is 43 pages long, names the individuals involved in each of the alleged acts, provides specific dates on which certain acts occurred, and identifies allegedly false mailing statements by the dates they were issued. The additional discovery already provided by the Government includes "all of the API Mailing Statements, Qualification Reports and invoices mentioned in the [I]ndictment, as well as any other such documents in the Government's possession ...; computerized, searchable indices of the Mailing Statements and invoices, prepared by the Government;[5] numerous photographs of and forensic reports concerning the postage meters referenced in the Indictment; Postal Service records and correspondence relating to the postage meters; monthly, weekly and daily postage-usage logs maintained by API; petty-cash logs maintained by API; handwritten records relating to the charged bribes, ... [and] all similar documents in the Government's possession; two affidavits sworn in support of search warrants ...; and memoranda containing whatever post-arrest statements were made by the [D]efendants." (Gov.'s Mem. at 121.)

All of this information apprises the Defendants of the charges against them with sufficient precision to enable them to prepare a defense and avoid unfair surprise at trial. Accordingly, the information sought by Defendants is not necessary to assist Defendants in the preparation, and their request for a Bill of Particulars is DENIED.

### 2. Discovery Regarding Co–Conspirators and Confidential Informants, Jencks Act Material

Defendants request early or immediate production of names of any indicted or unindicted aiders, abettors, conspirators or co-conspirators. (*See, e.g.,* Kalina Affirm. (Bill of Particulars) at 9–11). Defendants also request early production of Jencks Act material. (*See, e.g.,* Grand Mem. (Discovery) at 20–24.)

█ The Government is not obligated to disclose the identities of any confidential informants or other witnesses prior to trial unless the Defendants make a showing that this knowledge is material to their defense. Fed.R.Crim.P. 16; *United States v. Saa,* 859 F.2d 1067, 1073 (2d Cir.1988). "Upon a showing of need, it is in the district court's discretion whether to compel disclosure of a witness list." *United States v. Belin,* No. 99 Cr. 214, 2000 WL 679138 at *10 (S.D.N.Y., May 24, 2000) (citing *United States v. Cannone,* 528 F.2d 296, 298 (2d Cir.1975)).

██ A defendant does not satisfy the burden of materiality only by showing that an informant was a witness to or a participant in the crimes charged. *Saa,* 859 F.2d at 1073. Here, Braun argues only that because the charged acts do not involve violence and there is no danger of witness intimidation, the requested information should be provided. (Braun Reply Mem. at 3–6.)

Defendants put the cart before the horse, as it is up to the Defendants first to show that the information is material. In

---

**5.** The computer indices were provided to defense counsel in hard copy and computer format, and the Mailing Statements, Qualification Reports and invoices identified in the Indictment were produced separately to Defendants. (Gov.'s Mem. at 121, unnumbered footnotes.)

the absence of a specific showing of need, disclosure is not necessary. *See United States v. Bejasa,* 904 F.2d 137, 140 (2d Cir.1990); *Belin,* 2000 WL 679138 at *10 (collecting and discussing cases). Defendants' request for names of all aiders, abettors, unindicted co-conspirators, and confidential informants is nothing more than a request for a witness list.

Defendants have also requested disclosure of Jencks Act material 120 days prior to trial. (Braun's Mem. at 18.) The Government has indicated that it will provide Defendants with a witness list when it provides Jencks Act material to Defendants in advance of trial, "in sufficient time for the [D]efendant[s] to make effective use of it." (Gov.'s Mem. at 141.)

Accordingly, Defendants' request for the names of any indicted or unindicted aiders, abettors, conspirators or co-conspirators, for a witness list, and for early disclosure of Jencks Act material, is DENIED at this time. In light of the anticipated complexity of the trial, the Government is directed to provide a witness list no later than 5 days before trial, and to comply with 18 U.S.C. § 3500 by providing Jencks Act material no later than five days before the witness is expected to testify. Nothing in this direction shall be construed to permit late disclosure of material if there exists an independent basis for earlier disclosure.

### 3. *Brady* and 404(b) Material

Defendants also request immediate or early disclosure of material pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Fed. R.Evid. 404(b).

Defendants have also made a specific request pursuant to *Brady,* seeking information regarding USPS employees who denied having been offered or having received bribes. The Government has provided the name of only one individual, and has indicated that "the names of any such other individuals known to the Government will be disclosed shortly." (Gov.'s Mem. at 143.) However, as of the date of Braun's reply, the Government had not disclosed any other individuals pursuant to Defendants' request. (Braun's Reply Mem. at 13.) Accordingly, the Government is hereby directed to disclose, immediately, the names of any USPS employees currently known to the Government who have denied having been offered or having received bribes.

The Government proposes to provide 404(b) material two weeks prior to trial. (Gov.'s Mem. at 134.) The Government also asserts that it will provide any *Brady* material "promptly" and "sufficiently in advance of trial to allow [Defendants] ... to use it effectively." (*Id.* at 141.) The Court notes that although "*Brady* does not explicitly prescribe time limits within which disclosure must happen, the prosecutor is under a duty to disclose such evidence upon demand." *United States v. Wang,* 1999 WL 138930 at *37 (S.D.N.Y. March 15, 1999).

Accordingly, the Court expects that the Government will comply with all of its *Brady* obligations as *Brady* material comes to light. Material pursuant to Fed. R.Evid. 404(b) shall be provided to Defendants no later than five days in advance of trial.

### 4. Additional Discovery Pursuant to Rule 16

Defendants also move for an order, pursuant to Fed.R.Crim.P. 16, granting discovery on numerous issues including, *inter alia,* copies of charts and summaries to be used at trial, expert witness lists, and preservation of rough notes of Government agents. To the extent that the Government has not yet met its obligations under Fed.R.Crim.P. 16, it is hereby directed to do so.

█ Defendant Grand requests preservation of rough notes of Government agents, asserting, without any citation to any case law, that such notes are "absolutely necessary to insure adequate opportunity for counsel to prepare and present

the defense." (Kalina Affirm. (Rough Notes) ¶ 2.) It is well-established, however, that Government agents "need not preserve such notes if the agents incorporate them into formal reports." *United States v. Elusma,* 849 F.2d 76, 79 (2d Cir.1988) (collecting cases). Further, the Government has instructed its agents to preserve their notes if they are not later incorporated into formal reports. (Gov.'s Mem. at 147.)

The Government indicates that, at present, it "has no charts or summaries that it plans to introduce at trial," (Gov.'s Mem. at 135), and that it has not yet determined whether it will offer any expert testimony at trial. (*Id.* at 136.) The Government has further indicated that, in the event charts or summaries will be used, or expert witnesses will testify at trial, the Government will disclose such charts or summaries "no less than one week before trial," (Gov.'s Mem. at 135), and the Government will disclose expert summaries "no later than two weeks prior to trial." (*Id.* at 136.)

In light of these representations, the Court DENIES Defendants' additional discovery requests at this time. In light of the anticipated complexity of the case, the Government is DIRECTED to notify the Defendants forthwith if it determines that expert testimony or charts or summaries will be used at trial, and to provide such charts and summaries as soon as is practicable, and no later than two weeks prior to trial.

### III. CONCLUSION

For the reasons stated above, Defendants' Motions to Dismiss are DENIED in their entirety. Defendants' Motions to Suppress all physical evidence are DENIED in their entirety. Defendants' Motions for Severance, of Counts and Defendants, are DENIED in their entirety.

Defendants' Motions for Discovery are DENIED at this time, with the exception of Defendants' specific Brady request for the names of any USPS employees cur-

rently known to the Government who have denied having been offered or having received bribes from any of the Defendants. Disclosure of additional *Brady* material shall be made to Defendants as it comes to light.

Defendant Yague's request for a suppression hearing is GRANTED. A suppression hearing shall be held on August 7, 2000, at 11:30 a.m. A status conference of all Defendants and counsel is hereby set for August 28, 2000, at 11:00 a.m.

The Court concludes that, pursuant to the Speedy Trial Act, 18 U.S.C. § 3161(h)(8)(A), the interest of justice is served by the exclusion of time between the date of this Memorandum and Order and August 28, 2000, and outweighs the best interests of the Defendants and the public in a speedy trial.

SO ORDERED.